49 CCPA

**Application of Joseph D. FISHER.**

**Patent Appeal No. 6783.**

United States Court of Customs and Patent Appeals.

Sept. 21, 1962.

Smith, Judge, dissented.

---

\* United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Judge O'CONNELL, pursuant to provisions of Section 294(d), Title 28, United States Code.

Frank T. Barber, Carl C. Batz, Chicago, Ill. (George R. Jones and Beale & Jones, Washington, D. C., of counsel), for appellant.

Clarence W. Moore, Washington, D. C. (Jack E. Armore, Washington, D. C., of counsel), for Comr. of Patents.

Before WORLEY, Chief Judge, RICH, MARTIN and SMITH, Judges, and Judge WILLIAM H. KIRKPATRICK.\*

MARTIN, Judge.

This is an appeal from a decision of the Board of Appeals of the United States Patent Office affirming the examiner's rejection of claims 12–16, all of the claims of appellant's application for a patent on an "Adrenal Gland Stimulating Concentrate."

Involved here are mixtures of substances obtainable by extraction of animal pituitary glands. Certain of these substances are designated "adrenocorticotrophic hormones," commonly abbreviated "ACTH." As their functional name, "adrenocorticotrophic," indicates,[1] such hormones have a stimulatory effect on the cortex or outer layer of the adrenal glands. It is an "adrenocorticotrophic

---

1. The following definition is found in Webster's New International Dictionary, 2d Ed. (1949):

"—trophy \* \* \* A combining form, \* \* \*, denoting *nutrition, nourishment, nurture,* \* \* \*.

Corresponding adjectives are formed in —trophic \* \* \*."

hormone concentrate" which is claimed in each of the appealed claims.

The following excerpt from the introductory portion of appellant's specification is a discussion of the *prior art* status of pituitary gland extractions and ACTH, and is relevant to this case:

"Considerable research has been carried on in connection with the extraction of animal pituitary glands and the literature discloses various methods that have been developed for such extractions and the character of the products obtained. As a result of such investigations, extracts were prepared which were suitable for injection into rats, guinea pigs, and similar animals.

\* \* \* \* \* \*

"The potency of the hormone products obtained by such prior methods has been considerably less than standard, and generally in the nature of 50% of standard. The generally accepted standard is that which has been adopted by The Technical Advisory Committee to the Study Section for Metabolism and Endocrinology of the National Institutes of Health. This standard is approximately that of a physically-chemically pure hormone extracted from the pituitary glands and described by Sayers, Sayers and Woodbury in Endocrinology, Volume 42, No. 5, May, 1948, page 385. More recently the above-mentioned standard has been adopted as "International Standard". One milligram of the standard (also referred to as "LAIA") equals one International unit.

"By reason of the low potency of the adrenocorticotrophic hormone products heretofore produced and because of their relatively high content of undesirable factors, such as posterior pituitary hormones, such products have not been satisfactory for the treatment of humans. In most cases, the product has contained excess salts and undesirable active principles which cannot be tolerated by the human being. This is further aggravated by the extremely low potency of the product.

"In the extract of animal pituitary glands, it is found that the extract contains, in addition to the adrenocorticotrophic hormones, certain undesirable factors which are tolerated only in very limited amounts by the human being. Principal among these are the posterior pituitary hormones which are generally referred to as "posterior pituitary factors" or "contaminants". These are protinaceous [sic] material and consist mainly of oxytocic and vasopressor principles. Other anterior pituitary hormones are also found in the extract.

"The posterior pituitary factors containing oxytocic and vasopressor activity, if present in the injected adrenocorticotrophic extract, have an adverse effect upon the abdominal muscles, giving the patient cramps, causing an increase in the blood pressure and a change in the amount of urine secreted, and creating also a serious metabolic unbalance in the system \* \* \*."

The following statement from appellant's brief is also pertinent with regard to the prior art:

"Fisher [the appellant] does not deny that ACTH was known before he began his work. As pointed out in the introductory part of Fisher's own specification [quoted supra], and as indicated in the prior art cited by the Examiner, certain crude mixtures containing ACTH were known before Fisher entered the field. It was also known that when these crude ACTH mixtures were injected into animals having artificially atrophied adrenals, the ACTH seemed to have a restorative and nutrient effect on the adrenals. In other words, the prior work had suggested that, in the functioning of the animal body, an influence was exerted upon the adrenal glands by a substance (ACTH) secreted by the pituitary gland."

Thus it appears that the prior art ACTH concentrates are useful for injection into "rats, guinea pigs, and similar animals" but, because of low potency and high contamination, in "most cases * * * cannot be tolerated by the human being."

Appellant's aim was the production of an ACTH concentrate "substantially free of" the posterior pituitary factors above mentioned with an ACTH "potency at least equal to that of the International Standard" as above defined, which would be suitable "for injection into a human being for alleviating pathological conditions" such as "forms of arthritis." It has not been questioned that appellant has described how to produce such a concentrate and that the concentrate is useful for the stated purpose.

Claim 12, considered illustrative by appellant, is as follows: [2]

"12. [A] An adrenocorticotrophic hormone concentrate having a potency at least equal to that of the International Standard, said concentrate having a posterior pituitary contamination at least as low as 0.08 unit of vasopressin activity per International unit of adrenocorticotrophin potency, and

"[B] being further characterized by its solubility in glacial acetic acid and phenol; by its relative insolubility in other organic solvents; by its greater stability under acid conditions than under alkali conditions; by its susceptibility to attack by proteolytic enzymes and peptidases; and by its positive reaction to the Millon and xanthoproteic tests for tyrosine, the biuret test for peptide linkages, and the ninhydrin test for free amino groups in the alpha position, the Sakaguchi test for guanidine groups, and the Hopkins-Gole and benzaldehyde tests for indole nuclei and tryptophane."

We wish first to point out that appellant's counsel stated at the oral argument of this case that the characteristics recited in part B of claim 12, supra, "are all found in the prior art" and are *not* relied on "to distinguish the prior art." It is apparent, therefore, that appellant relies on part A of claim 12 for whatever novelty there is in his invention as claimed.

The board affirmed the examiner's rejection of the appealed claims on each of three grounds. Since we agree with the board as to one ground of rejection, we will consider only that ground.

The examiner rejected the claims as not defining the invention with the "particularity required by 35 U.S.C. 112."

The board affirmed this rejection, finding that "the description in the claims" was not "adequate to define the compositions as required by 35 U.S.C. 112." The board found on the part of appellant "a desire to claim products in terms of their function, not limited to any particular structure." The board stated, inter alia:

"Appellant's claims characterize the hormone concentrate by many properties which are common to prior art compounds and differ thereover only in a statement of the lack of certain impurities giving undesired side reactions, which impurities are defined functionally only; the product is identified only as a concentrate similar to that of the prior art but differing by the absence of a particular functionally defined side reaction. The criteria set forth, other than the functional statement of the lack of an undesired side reaction, would not enable one skilled in the art to differentiate over known products, to determine if the product were old or new. * * * "

We agree with the board that the appealed claims do not satisfy the mandate of the second paragraph of 35 U.S.C. § 112 relative to "particularly pointing out and distinctly claiming the subject mat-

2. We have divided claim 12 into two parts, [A] and [B], to aid in discussion.

The symbols, [A] and [B], do not appear in the claim.

ter which the applicant regards as his invention."

First, we again point out that any elements of novelty in appellant's concentrate must appear in part A of claim 12.[3] Appellant relies for novelty solely on a particular minimum "potency" and a particular maximum "posterior pituitary contamination."

In our opinion, the word "potency" is used in claim 12 in the sense of "ability to effect a certain result."[4] Thus, the recitation in claim 12 that the concentrate exhibit "a potency at least equal to the International Standard" defines what that concentrate will do rather than what it is.[5] In other words, the "potency" of appellant's concentrate is revealed only when the concentrate is either used for the intended purpose or compared by some test procedure with the "International Standard."[6] "Potency" here is a *result of use* and in that sense is a functional term. Saying that appellant's concentrate is more potent than prior art concentrates[7] is merely saying that appellant's concentrate will *perform* somewhat differently and, perhaps from one point of view, better than the prior art concentrates.

The recitation in claim 12 that the concentrate have "a posterior pituitary contamination at least as low as 0.08 unit of vasopressin activity per International unit of adrenocorticotrophin potency" is similarly an expression of what appellant's concentrate will do rather than what it is. It would be more accurate in discussing this particular claim recitation to say that it sets forth the *maximum* of what the claimed concentrate will do in this regard; included in claim 12 is a concentrate which has *no* vasopressin activity.[8] We believe that the word "activity" is used in claim 12 in the sense of "Natural or normal function or operation."[9] Thus, here again it is a type of performance or a result of use which appellant relies on to define and describe his concentrate.[10] The contaminant itself is not defined but rather only its function or behavior is recited in claim 12.

---

3. Appellant has not urged that there are any differences of patentable significance among the five appealed claims and we see none. Therefore, our decision as to claim 12 will be dispositive of claims 13 through 16. See footnote 5.

4. Definition of "potency," l. c., Webster's New International Dictionary, 2d Ed. (1949).

5. According to the excerpts from appellant's specification quoted elsewhere in this opinion, at least one prior art ACTH concentrate, that "described by Sayers, Sayers and Woodbury," is known to have a potency "approximately that" of the International Standard. Hence the particular potency recited in claim 12 does not seem to distinguish the concentrate of that claim (nor of appealed claims 13 and 14) from this admitted prior art concentrate. However, we note that appealed claims 15 and 16 require that the concentrates claimed therein have "a potency at least twice that of the International Standard." This difference between claims 12–14 and claims 15 and 16 is not of significance in our disposition of this case, and our remarks concerning claim 12 apply equally to claims 15 and 16.

6. The nature of such a test procedure is not set forth in the Patent Office record before us.

7. See however footnote 5.

8. It appears that "vasopressor activity" is synonymous with "vasopressin activity." We supplement what has been quoted from the specification as to the physiological effect of this particular "activity" with the following definition from Dorland's Illustrated Medical Dictionary, 23rd Ed. (1957):
   "vasopressin * * * It raises the blood pressure by stimulating the contraction of the muscular tissue of the capillaries and arterioles. * * * "

9. Definition of "activity," l. c., Webster's New International Dictionary, 2d Ed. (1949).

10. With regard to estimation of vasopressin activity, the specification states only that it "is determined according to the method recognized by the United States Pharmacopeia as compared with the standard preparation established thereby."

We believe that General Electric Co. v. Wabash Appliance Corp. et al., 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402, is particularly in point here. In that case, the Court held "invalid on its face" the following claim:

"25. A filament for electric incandescent lamps or other devices, ccmposed substantially of tungsten and made up mainly of a number of comparatively large grains of such size and contour as to prevent substantial sagging and offsetting during a normal or commercially useful life for such a lamp or other device."

Regarding this claim, the Court stated at page 368, 58 S.Ct. at page 901:

" * * * It fails to make a disclosure sufficiently definite to satisfy the requirements of R.S. § 4888, 35 U.S.C. § 33. That section requires that an applicant for a patent file a written description of his discovery or invention 'in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains· * * to make, construct, compound and use the same; * * * and he shall particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery.' We may assume that Pacz [the patentee] has sufficiently informed those skilled in the art how to make and use his filament. The statute has another command. Recognizing that most inventions represent improvements on some existing article, process or machine, and that a description of the invention must in large part set out what is old in order to facilitate the understanding of what is new, Congress requires of the applicant 'a distinct and specific statement of what he claims to be new, and to be his invention.' [Merrill v. Yeomans, 94 U.S. 568, 570, 24 L.Ed. 235.] Patents, whether basic or for improvements, must comply accurately and precisely with the statutory requirements as to claims of invention or discovery. * * * "

The Court found that the claimed tungsten filament was not distinguished from "the product of earlier manufacture" by the phrase "made up mainly of a number of comparatively large grains." Then the Court stated: [11]

"The claim further states that the grains must be 'of such size and contour as to prevent substantial sagging and offsetting' during a commercially useful life for the lamp. The clause is inadequate as a description of the structural characteristics of the grains. Apart from the statement with respect to their function, nothing said about their size distinguishes the earliest filaments, and nothing whatever is said which is descriptive of their contour (termed by the District Court a 'very important element'), not even that they are irregular.

"The claim uses indeterminate adjectives which describe the function of the grains to the exclusion of any structural definition, and thus falls within the condemnation of the doctrine that a patentee may not broaden his product claims by describing the product in terms of function. [Holland Furniture Co. v. Perkins Glue Co., 277 U.S. 245, 256–258, 48 S.Ct. 474, 72 L.Ed. 868, and cases cited.] Claim 25 vividly illustrates the vice of a description in terms of function. 'As a description of the invention it is insufficient and if allowed would extend the monopoly beyond the invention.' [277 U.S. at 258, 48 S.Ct. at 479.] The Court of Appeals for the Ninth Circuit [which held the claim valid] relied on the fact that the description in the claims is not 'wholly' functional. * * * *But the vice of a functional claim exists not only when a claim is 'wholly' functional, if that is ever true, but also when the inventor is*

11. Bracketed cases cited by the Court.

*painstaking when he recites what has already been seen, and then uses conveniently functional language at the exact point of novelty. * * *"* [Emphasis ours.]

We think that part A of claim 12 in the case at bar is comparable to that portion of the claim in the General Electric case which the Court held described "the function of the grains to the exclusion of any structural definition." Using the language of the Court in the General Electric case, we hold that appealed claim 12 and the other claims at bar use "conveniently functional language at the exact point of novelty," and for this reason do not particularly point out and distinctly claim the alleged invention as required by 35 U.S.C. § 112. See also In re Shortell, 173 F.2d 993, 36 CCPA 1013.[12]

In his brief, appellant relies on certain cases. His basic position seems to be that in each of these cases, the court found patentable or sustained the validity of claims "directed to the purified form of an already existing product,"[13] and that the cases are therefore authority for holding patentable his claims. In view of our disposition of the case at bar, we do not believe any of those cases are apposite. In Kuehmsted v. Farbenfabriken of Elberfeld Co., 179 F. 701 (7th Cir. 1910), cert. denied, 220 U.S. 622, 31 S.Ct. 724, 55 L.Ed. 613 (1911); Union Carbide Co. v. American Carbide Co., 181 F. 104 (2d Cir. 1910); and In re Williams, 171 F.2d 319, 36 CCPA 756, all cited by appellant, at issue was the validity or patentability of claims which in each case recited definite chemical compounds partially in terms of systematic nomenclature or structural formula and partially in terms of physical or chemical characteristics, and not, as in the case at bar, with "functional language at the exact

point of novelty." Moreover, the form of the claims was not an issue in those cases.

In Parke-Davis & Co. v. H. K. Mulford & Co., 196 F. 496 (2d Cir. 1912), also cited by appellant, the appellate court held certain claims valid and infringed. One such claim was as follows:

"1. A substance possessing the herein-described physiological characteristics and reactions of the suprarenal glands in a stable and concentrated form, and practically free from inert and associated gland tissue."

Except as to certain questions of infringement and claim breadth, the appellate court expressed full concurrence with the lower court opinion upon "all the main fundamental questions." We turn therefore to that lower court opinion, 189 F. 95 (C.C.S.D.N.Y.1911). The following at page 103 of that case is relevant to our position in the case at bar:

"Nor do any of the claims call for only an 'effect.' That rule I understand to mean nothing more than that the claims must not be too abstract. I do not think that any of the claims in the patent are at all abstract, but each forms a concrete enough criterion to test the product intended. There is no claim which selects a single characteristic or function. The very phrase 'physiological characteristics and reactions of the suprarenal glands' refers to some 15 lines of the specification (page 2, lines 102–116), and this phrase is always coupled with at least two other differentia. That is sufficient to identify the product in my judgment in every case."

---

12. Unlike In re Arbeit et al., 206 F.2d 947, 41 CCPA 719, the case at bar does not involve a combination of elements, one or more of which "may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof," as permitted by the third para-

graph of 35 U.S.C. § 112. Hence it is unnecessary in the case at bar to discuss the effect, if any, of that paragraph on the rationale of General Electric Co. v. Wabash Appliance Corp. et al., 304 U.S. 364, 58 S.Ct. 899.

13. Appellant's brief.

It is not clear to us what rule of law, if any, may have been established by this part of the Parke-Davis case. In view of General Electric Co. v. Wabash Appliance Corp. et al., supra, however, we are unable to accept the Parke-Davis case as authority contrary to the position we have taken in the case at bar.

Finally, appellant has cited Merck & Co., Inc. v. Olin Mathieson Chemical Corporation, 253 F.2d 156 (4th Cir. 1958). There, in an infringement suit, certain product claims such as the following were held valid:

"1. A vitamin $B_{12}$-active composition comprising recovered elaboration products of the fermentation of a vitamin $B_{12}$-activity producing strain of Fungi selected from the class consisting of Schizomycetes, Torula, and Eremothecium, the L.L.D. activity of said composition being at least 440 L.L.D. units per milligram and less than 11 million L.L.D. units per milligram."

It appears that such compositions were useful in treating pernicious anemia patients. The court in the Merck case rejected the "real contention of the defendant" that the claims at issue were invalid because they "cover a product of nature."

Although the above quoted claim from the Merck case does recite "L.L.D. activity" [14] of the claimed "vitamin $B_{12}$-active composition", the claim also recites that the composition comprises "recovered elaboration products of the fermentation of a vitamin $B_{12}$-activity producing strain of Fungi * * *." It appears from the Merck opinion that before the invention there at issue, "the anti-pernicious anemia factor was known to exist only in liver," that the patentees had discovered that this factor could also

be obtained "cheaply and abundantly" by certain fermentations, and that the "claims do not cover vitamin $B_{12}$ compositions derived from liver or any source other than the specified fermentates."

In view of those facts, it is our opinion that the Merck case is not authority for holding patentable the claims now before us. Not only is appellant not the first to isolate an ACTH concentrate from pituitary glands but also the prior art discussed by appellant in his own specification clearly teaches the desirability of a high potency and a low posterior pituitary contamination in an ACTH concentrate intended for use in human therapy. In the Merck case, on the other hand, the court clearly attributed considerable significance to its finding that the claim characteristic relating to specific fermentates was a point of novelty.

Appellant may well have made a valuable contribution to medical science. We agree with the board, however, that the appealed claims do not satisfy the requirement of 35 U.S.C. § 112.

The decision of the board is affirmed.

Affirmed.

SMITH, Judge (dissenting).

The Board of Appeals affirmed the examiner's rejection of the appealed claims on three separate grounds:

(1) the description in the claims was found not to be "adequate to define the compositions as required by 35 U.S.C. 112, nor to so identify them that a determination of obviousness, as related to the prior art, can be made as required in 35 U.S.C. 103";

(2) the claims were found to be unduly multiplied,[1] and

(3) the claims were rejected "as lacking invention over Collip." [2]

14. It appears that "L.L.D. activity" refers to "the rate of growth of Lactobacillus lactis, Dorner," and is a measure of "anti-pernicious anemia potencies."

1. The examiner's rejection for this reason was "sustained as to all but one of the rejected claims."

2. "Lacking invention" is here taken to mean a rejection for *obviousness* under 35 U.S.C. § 103.

The majority opinion in affirming the action of the board, on the first ground, i. e., inadequacy of the claims under 35 U.S.C. § 112, seems to me to have placed an unjustified interpretation on this ground of rejection in order to transform it into a rejection based on the alleged use of "conveniently functional language at the exact point of novelty," as this phrase is used in General Electric Co. v. Wabash Appliance Corp. et al., 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402 (1937). After taking this view of the board's action, the majority does not pass upon grounds 2 and 3 of the board's opinion.

It is my position that the appealed claims were not properly rejected under 35 U.S.C. § 112 *as applied by the examiner and the board*; that the claims are "unduly multiplied" *only* as this rejection is applied to claim 12; and that claims 13–16, inclusive, define an invention which is patentable over Collip.

While the board and the majority predicate their respective rejections of the appealed claims on 35 U.S.C. § 112, they do so, it seems to me, on two entirely different portions of this section.[3] The position of the examiner and the board as summarized in the board's opinion is:

"Claims 12 through 16 are rejected as failing to properly define the alleged invention with the particularity required by 35 U.S.C. 112. It is the examiner's position that *the chemical compound attempted to be defined in the claims is not identified, in a manner ordinarily accepted in the art, with the degree of particularity to which the compound is susceptible.* Not only is chemical

structure absent but the empirical formula and the amino acid components which make up the protein-like product have not been set forth.

\*    \*    \*    \*    \*    \*

"While 35 U.S.C. 112 requires a product to be defined in terms clear and concise enough to enable one skilled in the art to determine what falls under the claims and what does not, as argued by appellant in page 22 of his main brief, *the definition of said product must also be sufficient so that the differences between it and prior art compounds can be determined, in order that a decision may be made as required by 35 U.S. C. 103* as to whether or not the claimed product is obvious from the teachings of the prior art." [Emphasis added.]

In my opinion, both the above quoted portions of the board's opinion, while referring in terms to the claims as required by the second paragraph of 35 U.S.C. § 112, actually are dealing with the type of definition of the claimed product, rather than with the use of "functional language" in the claims. As I view the rejection under 35 U.S.C. § 112, it raises an issue under the first paragraph of section 112, namely, is the invention defined "in such full, clear, concise and exact terms as to enable any person skilled in the art \*    \*    \* to make and use the same \*    \*    \*."

It has been recognized by those skilled in the chemical arts that a chemical substance may be defined—

(a) by a structure formula (or official nomenclature)

(b) by a product by process claim, and

3. The first two paragraphs of 35 U.S.C. § 112 are as follows:

"The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

"The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."

(c) by chemical or physical properties (fingerprinting) [4]

The examiner and the board here arbitrarily require, as a condition for patentability of a chemical composition, the use of a structural formula or "product by process" claims. The examiner and the board, by here insisting on one or the other of these types of definition, have excluded the recognized third type, that of defining the invention by its chemical or physical properties, i. e., its "fingerprints." At no place in either the examiner's answer or in the board's opinion, do I find any rejection of the claims as being "functional at the point of novelty."

The language of 35 U.S.C. § 112 is properly broad enough to leave much to the discretion of an applicant for patent as to how the invention is to be disclosed and claimed. The standard fixed by 35 U.S.C. § 112 is the general standard that the terms used must be so "full, clear, concise and exact" that the invention is disclosed to one of ordinary skill in the art to which it pertains, or with which it is most nearly connected, so that such person may "make and use the same." While it is understandable that administrative problems in the Patent Office would be lessened if all applicants were forced to disclose and claim their chemical inventions either by structural formulas or in "product by process" terms, I think it is beyond the authority of the Patent Office, or of this court, to require more of an applicant than Congress required under the general terms of 35 U.S.C. § 112. I would, therefore, test the language of the rejected claims against the provisions of 35 U.S.C. § 112 and *in the absence here of any showing* that the terms are not so "full, clear, concise and exact" as to enable one of ordinary skill in the pharmaceutical or the related chemical arts to make and use the invention, I would find the nomenclature of the claims adequate under 35 U.S.C. § 112.

In applying the statutory test of section 112 to the claims on appeal, claim 13 for example states that the concentrate contamination must be "as low as 0.08 unit of vasopressin activity per International unit of adrenocorticotrophin potency" and "at least as low as 0.05 unit of oxytocin activity" per International unit of potency. The units of vasopressin and oxytocic activity are set forth in appellant's specifications as follows:

"The vasopressin activity of my adrenocorticotrophic hormone product is determined according to the method recognized by the United States Pharmacopeia as compared with the standard preparation established thereby. The oxytocin activity of this product is determined by the uterine strip method which is also recognized by the United States Pharmacopeia. Another method which is suitably correlated with that of the United States Pharmacopeia analysis is the procedure of Coon as modified by R. E. Thompson, involving the analysis of rooster blood pressure."

The International unit of potency is also disclosed in the specification as follows:

"* * * The generally accepted standard is that which has been adopted by The Technical Advisory Committee to the Study Section for Metabolism and Endocrinology of the National Institutes of Health. This standard is approximately that of a physically-chemically pure hormone extracted from the pituitary glands and described by Sayers, Sayers and Woodbury in Endocrinology, Volume 42, No. 5, May, 1948, page 385. More recently the above-mentioned standard has been adopted as 'International Standard'. One milligram of the standard (also referred to as 'LAIA') equals one International unit."

4. Cf. Lecture of Dr. Heinrich Hellfritz delivered June 13, 1962, at the Polytechnic Institute of Brooklyn; Ex parte Brian, Radley, Custis and Elson, (P.O. Bd. Appls.), 118 USPQ 242, 245.

At no time during the prosecution of appellant's application in the Patent Office did the examiner or the board raise any question whether the standards of measurement set forth in the above excerpts from appellant's specification would be understood or comprehended by a person of ordinary skills in the pharmaceutical or related chemical arts. It seems to me that the limitations contained in claim 13 are as "full, clear, concise and exact" a description of the chemical or physical properties of appellant's concentrate as is required by 35 U.S.C. § 112. I do not consider, as the majority appears to do, that the recitals of the amount of vasopressin and oxytocin activity as a measure of the posterior pituitary contamination of the claimed concentrate constitues the use of "conveniently functional language at the exact point of novelty." They are recognized measurements, not unlike measurements of concentration, acidity, alkalinity, specific gravity, and a host of other physical and chemical properties which are accepted as recognized parameters of a particular chemical compound or concentrate. In all these fields, the measurement is made in terms derived experimentally from the function of the compound or concentrate in the particular test or experiment by which a given property of the compound or concentrate may be measured. This fact, it seems to me, distinguishes these claims from the claims before the court in the General Electric Co. v. Wabash Appliance Corp. et al. case, supra. There the claim was to a tungsten lamp filament which was asserted to have non-sagging properties. This function of the filament was attributed to the large grain sizes of the tungsten from which the filament was made. The novelty in the invention claimed resided in the use of these large grain sizes of the tungsten particles in forming the filament. No recognized parameters were stated for these sizes nor was "sagging" defined, thus leaving solely to experimentation the determina-

tion of whether or not a given filament might constitute an infringement.[5] This aspect of the case rests upon the earlier decision in Holland Furniture Co. v. Perkins Glue Co., 277 U.S. 245, 48 S.Ct. 474, 72 L.Ed. 868 (1927). It was also the subject of further comment and elaboration in United Carbon Co. et al. v. Binney & Smith Co., 317 U.S. 228, 63 S.Ct. 165, 87 L.Ed. 232 (1942), in which the Supreme Court emphasizes the fact that "in a limited field the variant must be clearly defined." (317 U.S. at 232, 63 S.Ct. at 167).

Here, it seems to me, the applicant has properly defined the "variant" over the prior art, i. e., the control of the posterior pituitary contamination within the limits of at least as low as 0.08 unit of vasopressin activity and at least as low as 0.05 unit of oxytocin activity, both per International unit of adrenocorticotrophin potency. I would, therefore, reverse the rejection of the claims under 35 U.S.C. § 112.

I pass now to the second ground of rejection, multiplicity of the claims. The board's opinion states this ground of rejection as follows:

"Claims 12 through 16 are also rejected as being unduly multiplied on the ground that five claims are not seen to be proper as based upon the disclosure of one single product.

"We have considered appellant's arguments but agree with the examiner's position since the claims, in our opinion, are not drawn to varying scope of compositions, but are directed to the same product defined in terms of more or less descriptive properties. Any claim having less than the maximum number of descriptive parameters is incomplete, and we do not consider it proper to vary the scope of intended coverage of a patent claim merely by varying the number of descriptive relationships set forth. No more than one claim is required to describe a single compound and that

---

5. See claim 25 of the Pacz patent quoted by the majority.

958

claim should include all of the necessary descriptive properties. The examiner's rejection, therefore, is sustained as to all but one of the rejected claims."

While not too aptly stated, I believe the underlying basis of this ground of rejection is that the disclosure does not support all five appealed claims. On the assumption that this is a correct understanding of this ground of rejection, I would affirm it and limit applicant to claims which are commensurate with the disclosure in his specification. Appellant attempts to justify the use of multiple claims on the basis of the statement in the specification that:

"Preferably, my adrenocorticotrophic hormone product has a posterior pituitary contamination at least as low as 0.08 unit of vaseopressin activity per International unit of adrenocorticotrophin potency. Further, it is preferred that this product have an oxytocin contamination at least as low as 0.05 unit per International unit of adrenocorticotrophin potency."

I am unwilling to give this statement in the specification the broad effect urged by appellant. The invention disclosed in the specification is an adrenocorticotrophic hormone concentrate in which "undesirable factors, such as posterior pituitary hormones" have been effectively eliminated while at the same time the potency of the active substance obtained is increased. The specification states that:

"In the extraction of animal pituitary glands, it is found that the extract contains, in addition to the adrenocorticotrophic hormones, certain undesirable factors which are tolerated only in very limited amounts by the human being. Principal among these are the posterior pituitary hormones which are generally referred to as 'posterior pituitary factors' or 'contaminants'. These are protinaceous material and consist mainly of oxytocic and vasopressor principles. Other anterior pituitary hormones are also found in the extract.

"The posterior pituitary factors containing oxytocic and vasopressor activity, if present in the injected adrenocorticotrophic extract, have an adverse effect upon the abdominal muscles, giving the patient cramps, causing an increase in the blood pressure and a change in the amount of urine secreted, and creating also a serious metabolic unbalance in the system."

It seems to me, therefore, that one of the parameters of appellant's new compound *as disclosed* is that it is substantially free from the *posterior pituitary factors* containing oxytocic *and* vasopressin activity. Appellant in his specification has not differentiated between the two activities insofar as their adverse physiological results are concerned. For this reason I do not think appealed claim 12 completely sets forth the disclosed invention. I would therefore affirm this rejection of claim 12.

Claim 13 which recites the parameter of being "substantially free of posterior pituitary factors" in terms of both its vasopressin *and* oxytocic activity seems to me to be commensurate in scope with the disclosure in the specification. Claim 14 in addition contains a minimum pH limitation and states that the concentrate is "dialyzable at a pH below 4.0." Claim 15, dependent on claim 14, requires a potency twice that of claims 13 and 14. Claim 16 requires the increased potency of claim 15 but does not include the limitation that the concentrate be "dialyzable at pH below 4.0." These variants in scope are supported by appellant's specification and are, in my opinion, such variables as an applicant is entitled to cover in separate claims. See In re Wood and Turner, 155 F.2d 547, 33 C.C.P.A. 984.

The third and remaining ground of rejection is that the appealed claims are "lacking in invention over Collip." Normally I would construe this as a rejection for obviousness under 35 U.S.C. § 103. Here, however, I find an inherent incon-

sistency in the board's opinion. The board in sustaining the examiner's rejection of the claims under 35 U.S.C. § 112 said:

"The examiner's rejection, therefore, will be sustained since we do not find the description in the claims adequate to define the compositions as required by 35 U.S.C. 112, nor to so identify them that a determination of obviousness, as related to the prior art, can be made as required in 35 U.S.C. 103."

Despite this unequivocal holding, the board, after reconstruction of the Collip reference, states:

"After a careful study of appellant's briefs and of the arguments and decisions cited therein, we do not consider the examiner's rejection to have been overcome. The decisions cited by appellant, including the Merck & Co., Inc. v. Olin Mathieson Chemical Corp., supra, decision, apparently relate to purified existing products, but the composition herein at issue differs from previously existing products by being a chemical reaction product thereof wherein the structure of the molecule is apparently altered by an acid hydrolysis at a pH below 2.5 and a temperature above 50°C. The derivative thus produced is not, in our opinion, merely a purified prior art product but is a chemically altered one, and the rejection herein is now restricted to a reference alleged to teach the described chemical alteration. The rejection, therefore, is not based upon ' "a scientific ivory-tower curiosity". [sic] ACTH' but upon the composition inherently pro-

duced in Collip under his described conditions of acid hydrolysis."

My study of the Collip reference fails to reveal any teaching by Collip of an adrenocorticotrophic hormone concentrate in which the posterior pituitary contamination, measured in terms of its vasopressin and oxytocin activity, falls within the limits specified in the rejected claims. Even when given the benefit of the board's reconstruction, Collip, at best, would produce such a concentrate only as an accidental, unexpected and wholly unappreciated result of his tests which he discloses are for the purpose of determining the heat stability of the adrenotropic principle being tested. If I were in doubt on this point, I would resolve it in favor of appellant since Collip's publication at best is an inert disclosure which while it remained a part of the published art since 1937, was unnoticed and, so far as this record discloses, wholly without significance in teaching how to solve the problems which appellant solved and for which he filed the present application. Except as Collip is now reconstructed by the examiner and the board with hindsight and with knowledge of appellant's teachings, it seems to me it adds nothing to the solution of the problem faced by the art and which remained unsolved after Collip's 1937 publication. Such a hindsight reconstruction is, of course, prohibited. Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., 321 U.S. 275, 279, 64 S.Ct. 593, 88 L.Ed. 721 (1943).

For the foregoing reasons, I would modify the appealed decision, affirming it only as to the rejection of claim 12 on the second ground of rejection and reversing all grounds of rejection of claims 13–16, inclusive.