57 CCPA

**Application of Joseph D. FISHER.**

**Patent Appeal No. 8208.**

United States Court of Customs and Patent Appeals.

June 11, 1970.

Carl C. Batz, Frank T. Barber, Chicago, Ill., attorneys of record, for appellant. George R. Jones, Robert H. Berdo, Beale & Jones, Arlington, Va., of counsel.

Joseph Schimmel, Washington, D. C., for the Commissioner of Patents. Jack E. Armore, Washington, D. C., of counsel.

Before RICH, Acting Chief Judge, ALMOND, BALDWIN, and LANE, Judges, and MATTHEWS, Senior Judge, United States District Court for the District of Columbia, sitting by designation.

LANE, Judge.

This appeal is from the decision of the Patent Office Board of Appeals, which affirmed the rejection of claims 4 and 5, the only claims remaining in appellant's application serial No. 72,481, filed November 29, 1960, for Adrenal Gland Stimulating Concentrate and Method for the Preparation Thereof. The application is a continuation-in-part of a prior co-pending application serial No. 435,451, filed June 9, 1954, which was before this court in In re Fisher, 307 F.2d 948, 50 CCPA 1025 (1962). That application was a continuation of application serial No. 122,588, filed October 20, 1949, which we shall refer to as the parent application.

## THE DISCLOSURE

The instant specification relates to the preparation of substances containing adrenocorticotrophic hormones (ACTH) in a composition suitable for injection into human beings in the treatment of certain forms of arthritis and other human pathological conditions. It is stated that previous ACTH products were unsatisfactory for administration to humans because of their low potency, generally around 50% of "International Standard," and because of their relatively high content of undesirable factors, notably posterior pituitary hormones which consist mainly of oxytocic and vasopressor principles. A method[1] is disclosed for producing ACTH preparations having potencies ranging from 111% to 230% of

standard and containing no more than 0.08 units of vasopressin and no more than 0.05 units of oxytocin per International Unit of ACTH, which limits are said to be tolerable to humans. The method generally starts with frozen pituitary glands of hogs, sheep, beef or other animals, including whales. These glands are quick-thawed in an organic solvent to extract contaminated ACTH from the gland meat. A precipitate containing the active material is recovered, free of contaminants, by treatment with fractionating salts. The material is then subjected to hydrolysis, and an inactive fraction of hydrolized fragmented material is separated from a fraction containing the active substance. The active fraction is then adjusted to a pH above 2.8, the excess salts being separated from the concentrate of the active principle. Several variations of this procedure are set forth and six specific examples are given. The specification then states that the ACTH concentrate produced as described is found to contain peptides having free amino and carboxyl groups, and is further characterized

by its solubility in glacial acetic acid and phenol; by its relative insolubility in other organic solvents; by its greater stability under acid conditions than under alkali conditions; by its susceptibility to attack by proteolytic enzymes and peptidases; and by its positive reaction to the Millon and xanthoproteic tests for tyrosine, the biuret test for peptide linkage, the ninhydrin test for free amino groups in the alpha position, the Sakaguchi test for guanidine groups, and the Hopkins-Gole and benzaldehyde tests for indole nuclei and tryptophane.

The specification then states that the product can be characterized structurally as a peptide containing a chain of identifiable amino acids. While the exact sequence will vary from product to product, depending on the source and preparative history of the product, the *first 24*

---

1. The method is said to be covered by appellant's patent 3,192,115, issued June 29, 1965.

amino acids in the chain, counting from the N terminus of the molecule, will have the following sequence: (1) Serine, (2) Tyrosine, (3) Serine, (4) Methionine, (5) Glutamic Acid, (6) Histadine, (7) Phenylalanine, (8) Arginine, (9) Tryptophan, (10) Glycine, (11) Lysine, (12) Proline, (13) Valine, (14) Glycine, (15) Lysine, (16) Lysine, (17) Arginine, (18) Arginine, (19) Proline, (20) Valine, (21) Lysine, (22) Valine, (23) Tyrosine, (24) Proline. ACTH obtained from hogs contains a sequence of 39 amino acids, the first 24 being as recited above; ACTH obtained from sheep or beef also contains a sequence of 39 amino acids, the first 24 being as recited, and the 25th to 39th being in a sequence different from that of the hog extract.[2] No structural description is given for ACTH extracted from other animals.

## THE CLAIMS

Appellant defines the subject matter sought to be patented as follows:

4. An adrenocorticotrophic hormone preparation containing at least 1 International Unit of ACTH per milligram and containing no more than 0.08 units of vasopressin and no more than 0.05 units of oxytocin per International Unit of ACTH, and being further characterized as containing as the active component of [a?] polypeptide of at least 24 amino acids having the following sequence from the N terminus of the molecule; Serine, Tyrosine, Serine, Methionine, Glutamic Acid, Histadine, Phenylalanine, Arginine, Tryptophan, Glycine, Lysine, Proline, Valine, Glycine, Lysine, Lysine, Arginine, Arginine, Proline, Valine, Lysine, Valine, Tyrosine, Proline.

5. An adrenocorticotrophic hormone preparation containing at least 1 International Unit of ACTH per milligram and containing no more than 0.08 units of vasopressin and no more than 0.05 units of oxytocin per International Unit of ACTH, and being further characterized by its solubility in glacial acetic acid and phenol; by its relative insolubility in other organic solvents; by its greater stability under acid conditions than under alkali conditions; by its susceptibility to attack by proteolitic enzymes and peptidases; and by its positive reaction to the Millon and xanthoproteic tests for tyrosine, the biuret test for peptide linkages, and the ninhydrin test for free amino groups in the alpha position, the Sakaguchi test for guanidine groups, and the Hopkins-Gole and benzaldehyde tests for indole nuclei and tryptophane.

## OPINION

There are many grounds of rejection affirmed by the board in this case. We shall set them forth separately, with our opinion on each.

### (a) *The res judicata rejection*

The board affirmed the examiner's rejection of claim 5 on the ground of res judicata, stating that the claim differed from claim 13 in *Fisher, supra,* "mainly in calling for a 'preparation containing at least 1 International Unit of ACTH per milligram' in place of the terminology in claim 13 'concentrate having a potency at least equal to that of the International Standard.'" The board held this to be "no significant difference other than in verbiage." We reverse the board on this ground of rejection. "Verbiage" was the very problem in *Fisher.* The court there found that the words "a potency at least equal to the International Standard" rendered the claims unpatentable under the second paragraph of 35 U.S.C. § 112. 307 F.2d at 950–951, 50 CCPA at 1029. These words do not appear in the claims before us. Thus, a different issue is presented and res judicata does not apply. See In re Fried, 312 F.2d 930, 50 CCPA 954 (1963).

2. The 25-to-39 sequence for sheep is set forth, but for beef the sequence is apparently unknown. It is stated that the empirical formula for beef and sheep ACTH is the same.

**(b)** *The rejection on the Li references*

The examiner rejected claim 4 under 35 U.S.C. § 102 as anticipated by the following references:

Li et al. (III), Science, vol. 124, p. 934 (Nov. 9, 1956).

Li et al., J.A.C.S., vol. 80, No. 10, pp. 2587–88 (May 20, 1958).

Appellant did not contest the pertinence of these references, but sought to remove them by relying on his parent application which, as mentioned above, was filed in 1949. The examiner took the position that appellant was not entitled to the parent date under 35 U.S.C. § 120 because the parent contained insufficient disclosure to support claim 4 in the manner required by the first paragraph of 35 U.S.C. § 112. The board affirmed this rejection for two reasons. First, since the parent application lacked any structural description of the ACTH extracts therein disclosed, the Board concluded that it could not be determined whether those products would meet the terms of claim 4, which recites a specific sequence of the first 24 amino acids. Appellant contended that the parent application *inherently* disclosed products meeting the terms of claim 4, even though appellant did not know the chemical structure of those products when the parent application was filed. Appellant cited several cases in support of the proposition that inherent disclosure is sufficient under 35 U.S.C. § 112, including Riester v. Kendall, 159 F.2d 732, 34 CCPA 859 (1947), and In re Nathan, 328 F.2d 1005, 51 CCPA 1059 (1964). The board did not dispute the correctness of this proposition, but found that "it has not been established that the parent disclosures inherently produce the claimed products * * *." We agree with appellant that this finding was erroneous. The parent application discloses treatment of hog pituitary extracts. The Li (J.A.C.S.) article discloses the amino acid sequence for beef ACTH and states that the first 24 amino acids in the sequence are the same for porcine (hog) ACTH, namely, the sequence recited in claim 4. The hog-extracted products disclosed in appellant's parent application must therefore have had the recited sequence. The board's second reason for holding the parent application insufficient to support claim 4 was that the products disclosed in the parent were insufficient to support a claim of the breadth of claim 4. On this point we agree with the board. The claim recites that the product must contain "at least" 24 amino acids in a specified sequence. The parent disclosure mentions treating extracts from "hog, beef, lamb, and other animal pituitary glands, and including also pituitary glands of whales." From the instant specification and the Li articles, we know that hog, beef and lamb ACTHs will contain 39 amino acids, of which the first 24 will be in the recited sequence. We do not know, from the record, the chemical structure of ACTHs of whales or other animals. Appellant's parent application, therefore, discloses no products, inherently or expressly, containing *other* than 39 amino acids, yet the claim includes all polypeptides, of the recited potency and purity, having at least 24 amino acids in the chain in the recited sequence. The parent specification does not enable one skilled in the art to make or obtain ACTHs with other than 39 amino acids in the chain, and there has been no showing that one of ordinary skill would have known how to make or obtain such other ACTHs without undue experimentation. As for appellant's conclusion that the 25th to 39th acids in the chain are unnecessary, it is one thing to make such a statement when persons skilled in the art are able to make or obtain ACTH having other than 39 amino acids; it is quite another thing when they are not able to do so. In the latter situation, the statement is in no way "enabling" and hence lends no further support for the broad claim. We conclude that appellant's parent application is insufficient to support a claim as broad as claim 4. For this reason we affirm the board's rejection of claim 4 as unpatentable over the Li references.

### (c) *The rejection on Collip*

The examiner rejected both claims under 35 U.S.C. § 102 as unpatentable over Collip, "Properties of Anterior Lobe Extracts," *Symposia Quant. Biol.*, vol. 5, pp. 210–12 (1937). The examiner's position was that, although Collip does not expressly anticipate the claims, Collip and appellant prepare their ACTH under identical conditions, and it follows that the products produced are identical. The board noted that Judge Smith's dissenting opinion in *Fisher*, supra, expressed the view that Collip did not render similar product claims obvious under 35 U.S.C. § 103. The majority in *Fisher* did not reach that issue. The board here concluded, however, that the examiner's rejection on Collip under 35 U.S.C. § 102 was correct. The board stated: "Since the claim terminology is not sufficiently definite to positively distinguish over the products inherently produced by following the Collip disclosure, this rejection will be sustained." Appellant contends, and we agree, that Collip is deficient in so many material respects that it cannot be reasonably concluded that it discloses anything like the compositions here claimed. There is substantial doubt as to whether Collip uses a pH less than 3.0. The doubt arises because the pH at the origin of a Collip graph of pH vs. weight of adrenals is not indicated by a numeral. The solicitor contends that this point represents a pH of 1.0. Appellant contends that it is merely a control point, and supports this contention by observing that controls are stated on the graph and that, if a pH of less than 3.0 were actually used, an increase of activity should result, as taught by appellant, rather than a decrease as indicated by the Collip graph. Further, as pointed out by Judge Smith, Collip describes experiments on rats and guinea pigs, and there is no indication that the vasopressin and oxytocin levels in the Collip products were within the safe-for-humans levels which are recited in the claims and which are an important aspect of appellant's contribution to the art. In view of these deficiencies, we believe appellant was not obliged to present comparative evidence to rebut the Patent Office position on the inherent disclosure of Collip. We reverse the board's affirmance of the rejections on Collip.

### (d) *The indefiniteness rejection*

The examiner rejected both claims for indefiniteness under the second paragraph of 35 U.S.C. § 112. He stated:

> Claim 4 is indefinite in not setting forth the entire composition chemically. It would appear that the amino acid sequence is only part of the chemical structure of the composition. Claims 4 and 5 are indefinite in not setting forth with particularity the chemical structure or adequate physical characteristics to identify the composition. * * *.

The board affirmed the indefiniteness rejection and gave reasons in addition to those stated by the examiner. We find that the claims before us are in compliance with the second paragraph of section 112 and that the board's affirmance of the indefiniteness rejection must be reversed. We shall discuss each reason given by the board.

The board first found that some of the issues were the same as those treated by the board in the earlier *Fisher* case involving appellant's earlier application. The board here quoted several pages from its earlier opinion, the gist of which appears to be that the claims there involved, which recited no chemical structure, were indefinite in that the potency and purity limitations there recited were inadequate to enable a decision to be made as to patentability over the prior art. The criticism of the use of the word "potency" was affirmed by this court in *Fisher*, supra. The word does not appear in the claims before us. The relevance of the quoted portion of the board's earlier opinion therefore appears to be with regard to the expression appearing in the present claims: "Containing at least 1 International Unit of ACTH per milli-

gram and containing no more than 0.08 units of vasopressin and no more than 0.05 units of oxytocin per International Unit of ACTH." The specification states that "International Standard" means the generally accepted standard adopted by The Technical Advisory Committee to the Study Section for Metabolism and Endocrinology of the National Institutes of Health, and that one milligram of the standard equals one International Unit. We fail to see anything indefinite in such a recitation. We recognize a problem in determining differences over the prior art where the claim uses language which is now accepted and precise but which was not used in the art at the time the prior-art references were published. However, were we to require that claims speak in the language of the prior art, we would be prohibiting the use of the newer and frequently more precise language of the present art. We think that the proper solution to this problem is to allow the use of new expressions when they are definite, and to allow the Patent Office, as it has always done, to call for comparative evidence when there is reason to believe that the prior art discloses matter which renders the claimed subject matter old or obvious.

The board next agreed with the examiner that "the claims are so broad as to be indefinite in that they do not positively identify the entire chemical structure of the compound desired to be claimed." The board noted that claim 4 recited only a portion of the molecule, namely at least 24 amino acids in a certain sequence, "which does not describe adequately the products formed in appellant's specification." Here the examiner and the board have viewed the absence of a limitation as to amino acids beyond the 24th position as rendering the claim indefinite. While the absence of such a limitation obviously broadens the claim and raises questions of sufficiency of disclosure, it does *not* render the claim indefinite. The absence of the limitation has a precise meaning. Regardless of the specification, the claimed subject matter is in no way limited by the presence, absence or sequence of amino acids beyond the 24th position. This principle is the very basis of this court's consistent refusal to read limitations of the specification into the claims. See In re Prater, 415 F.2d 1393, 56 CCPA 1381 (1969), and cases therein cited. In our recent decision in In re Wakefield, 422 F.2d 897, 57 CCPA (1970), we considered an indefiniteness rejection involving the absence of a limitation. We reversed the rejection, stating: "The scope of the claim is still definite, however, because each recited limitation is definite."

The board also found indefiniteness in the fact that the claims were not limited to compositions disclosed or suggested by appellant's specification, and would cover "a host of materials produced in any possible manner, including synthetically, which are neither taught nor represented by the specific materials actually formed in appellant's examples." Appellant does not dispute that the claims are as broad as the board indicated. This fact, however, while very important in assessing the sufficiency of appellant's disclosure to see if it will support such broad coverage, is entirely irrelevant to the issue of definiteness, for the reasons stated in the preceding paragraph.

We conclude that the board's affirmance of the rejection of the claims for indefiniteness under the second paragraph of 35 U.S.C. § 112 must be reversed.

### (e) *The rejection for insufficient disclosure*

The examiner did not reject the claims for insufficient disclosure. This was first applied by the board, although the board failed to denominate it a new ground of rejection under Rule 196(b). Appellant apparently did not complain of such failure, but chose to appeal here.

The board stated: "[W]e consider appellant's claims to be so broad that * * * the specification lacks sufficient supporting description to comply with the requirements of 35 U.S.C. § 112, first

paragraph." The board noted that the claims cover

> substantially all "preparations" produced synthetically or by breakdown of the 39 amino acid polypeptides in any manner to form a polypeptide product of lesser molecular weight containing any number (claim 5) or at least 24 (claim 4) of the amino acids as long as the product exhibits, without the stated side effects, activity equal to at least 1 International Unit of ACTH per milligram.

We have already discussed, with respect to the parent application, the lack of teaching of how to obtain other-than-39 amino acid ACTHs. That discussion is fully applicable to the instant application, and we think the board was correct in finding insufficient disclosure due to this broad aspect of the claims.

The second aspect of breadth mentioned by the board in the quoted portion of its opinion has not yet been discussed. This is the problem arising from the potency recitation "at least 1 International Unit of ACTH per milligram." This is a so-called "open-ended" recitation. It has a lower limit but no upper limit. As previously mentioned, the specification discloses products having potencies from 111% to 230% of standard, which we understand to mean from 1.11 to 2.30 International Units of ATCH activity per milligram. The issue thus presented is whether an inventor who is the first to achieve a potency of greater than 1.0 for certain types of compositions, which potency was long desired because of its beneficial effect on humans, should be allowed to dominate *all* such compositions having potencies greater than 1.0, including future compositions having potencies far in excess of those obtainable from his teachings plus ordinary skill.

 It is apparent that such an inventor should be allowed to dominate the future patentable inventions of others where those inventions were based in some way on his teachings. Such improvements, while unobvious from his teachings, are still within his contribution, since the improvement was made possible by his work. It is equally apparent, however, that he must not be permitted to achieve this dominance by claims which are insufficiently supported and hence not in compliance with the first paragraph of 35 U.S.C. § 112. That paragraph requires that the scope of the claims must bear a reasonable correlation to the scope of enablement provided by the specification to persons of ordinary skill in the art. In cases involving predictable factors, such as mechanical or electrical elements, a single embodiment provides broad enablement in the sense that, once imagined, other embodiments can be made without difficulty and their performance characteristics predicted by resort to known scientific laws. In cases involving unpredictable factors, such as most chemical reactions and physiological activity, the scope of enablement obviously varies inversely with the degree of unpredictability of the factors involved. In the present case we must conclude, on the record before us, that appellant has not enabled the preparation of ACTHs having potencies much greater than 2.3, and the claim recitations of potency of "at least 1" render the claims insufficiently supported under the first paragraph of 35 U.S.C. § 112.

Our conclusion is in no way opposed to the principles of the cases cited by appellant in support of his contention that he is entitled to coverage of the breadth now sought. Farbenfabriken of Elberfeld Co. v. Kuehmsted ("the aspirin case"), 171 F. 887 (N.D.Ill.1909), affd. 179 F. 701, 103 CCA 243 (7th Cir. 1910); In re Williams, 171 F.2d 319, 36 CCPA 756 (1948), and Parke, Davis & Co. v. H. K. Mulford & Co., 196 F. 496, 116 CCA 262 (2d Cir. 1912), each involved claims to substantially pure compositions. Such claims do not present the same breadth problem as here, because in those cases the possible range of further purification was either small or nonexistent. Such claims have an inherent upper limit of

100% purity, whereas in the present case it would appear theoretically possible to achieve potencies far greater than those obtained by appellant. Merck & Co. v. Olin Mathieson Chemical Corp., 253 F.2d 156 (4th Cir. 1958), involved a claim reciting an activity of "at least 440 L.L.D. units per milligram," but no issue appears to have been raised regarding that recitation and the court's opinion does not consider it.

For the reasons given above, the decision of the board is affirmed.

Affirmed.