**Geo. H. BUTTERFIELD, Sr., Plaintiff,**

v.

**OCULUS CONTACT LENS COMPANY, Inc., Defendant.**

**No. 69 C 1812 (and related cases).**

United States District Court,
N. D. Illinois, E. D.

Oct. 6, 1971.

Hamilton Smith, McDermott, Will & Emery, Chicago, Ill., for plaintiff.

Charles W. Rummler, Rummler & Snow, Chicago, Ill., for defendants.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND OPINION

WILL, District Judge.

These consolidated cases came on for trial before the Court and the Court having heard the evidence, considered the briefs and arguments of counsel for the parties and been fully advised in the premises, makes the following narrative, Findings of Fact and Conclusions of Law as part of its opinion.

All of the cases are similar in that they are actions for infringement of U. S. Patent No. 2,544,246 (hereinafter the

"Butterfield patent") which was issued to plaintiff March 6, 1951 and expired March 6, 1968. It has been owned by plaintiff at all times since its issuance.

The plaintiff is a resident of Portland, Oregon, a registered optometrist, and is also the controlling stockholder of George H. Butterfield & Son, a corporation engaged at Portland in the business of manufacturing and selling contact lenses. Plaintiff's son, George H. Butterfield, Jr., is also a registered optometrist and active in the company's management.

The defendants are all manufacturers of contact lenses, some in Chicago and others in other cities. All of the defendants who are not located in this district have consented in writing to have their cases tried by this Court on the issues of validity, notice and marking, but not on the issue of infringement. On the issues before the Court, therefore, we have jurisdiction over the subject matter and the defendants.

The defendants before the Court and their case numbers are as follows:

| | |
|---|---|
| Accurate Contact Lens Lab | 70 C 859 |
| Alvin Contact Lens Corporation | 70 C 966 |
| Appalachian Optics, Inc. | 70 C 1231 |
| Arlon Contact Lens Corporation | 70 C 1289 |
| Art Optical Contact Lens Division, Inc. | 70 C 858 |
| B & M Optical Company | 70 C 415 |
| B & R Enterprises, Inc. | 70 C 857 |
| Bell Optical Laboratory, Inc. | 70 C 928 |
| Calcon Laboratories | 70 C 1072 |
| Contact Lens Laboratory, Inc. | 70 C 942 |
| Contact Lens Service, Inc. | 69 C 2184 |
| Custom Contact Lens Laboratories, Inc. | 69 C 2186 |
| Custom Contact Lens Laboratories, Inc. | 70 C 339 |
| Gordon Contact Lenses, Inc. | 70 C 922 |
| Guaranteed Contact Lenses of Arizona, Inc. | 70 C 871 |
| Halcon, Inc. | 70 C 414 |
| Mueller's Contact Lens Service, Inc. | 70 C 864 |
| Obrig Laboratories, Inc. | 70 C 1282 |
| Oculus Contact Lens Co., Inc. | 69 C 1812 |
| Opti-LENS Company | 70 C 1254 |
| Quality Optics, Inc. | 70 C 330 |
| Ray-Con, Inc. | 70 C 868 |
| Reese Optical Co., Inc. | 70 C 866 |
| Onondaga Optical Co. | 70 C 863 |
| Safeway Contact Lens Co., Inc. | 70 C 943 |
| SCL Laboratories, Inc. | 70 C 324 |
| The House of Vision | 70 C 416 |
| The White-Haines Optical Co. | 70 C 887 |
| Vogel Contact Lens, Inc. | 70 C 412 |
| Wisconsin Optical Service, Inc. | 70 C 870 |
| Dr. Doyle O. Burch d/b/a Magic Circle Contact Lens Lab. | 70 C 856 |
| Lone Star Contact Lens Co. | 70 C 994 |
| Con-O-Lite, Inc. | 70 C 1230 |
| Rite-Style Optical Co., Inc. | 70 C 329 |
| Corneal Lens Laboratory, Inc. | 70 C 1069 |
| Gulf Coast Contact Lens, Inc. | 70 C 860 |
| Fred Rump Contact Lens Laboratory, Inc. | 70 C 867 |
| Contour Comfort Contact Lens, Inc. | 70 C 397 |

These cases, and others involving defendants who have not consented to the jurisdiction of the court for trial purposes, were initially assigned to this Court by the Judicial Panel on Multidistrict Litigation, pursuant to 28 U.S.C. Section 1407, for consolidation of discovery on all issues other than infringement. That discovery was completed in all cases prior to trial of the cases here involved.

The parties waived jury trial as to the cases and issues here involved and the cases were tried to the Court on (1) whether Claim 1 of plaintiff's patent is valid, (2) whether articles made under the patent by plaintiff or his licensees have been marked with the patent number in compliance with the provisions of 35 U.S.C. Section 287, and (3) whether, and to what extent, any of the defendants herein were, prior to the institution of suit against them, notified of their alleged infringement in compliance with the provisions of 35 U.S.C. Section 287.

Claim 1 of the Butterfield patent reads as follows:

1. A corneal contact lens of concavoconvex form in section and of a size to lie within the area defined by the limbus having an inner central spherical area conforming to the corresponding area of the cornea to which the lens is applied so that undue pressure will not be present at any point, the remainder of said inner surface extending radially outward toward the limbus being formed on a curve different from that of said central area and corresponding in curvature with that portion of the corneal peripheral area to which the lens is applied, whereby space is provided for the natural uninterrupted circulation of lacrimal fluids between said lens and the cornea.

## HISTORY OF THE BUTTERFIELD PATENT

The idea of using contact lenses was first contemplated by Leonardo da Vinci in the early 1500s, his concept being that one could put a transparent surface in front of the eye with fluid filling the space between that surface and the surface of the eye and thereby neutralize the effect of the cornea. In the early 1600s, Descartes placed a relatively large chamber filled with water against the eye to achieve the same effect. In the early 1800s, one Thomas Young performed experiments involving the concept of a contact lens. The first contact lenses at all comparable to today's standards were constructed in Germany about 1888 by A. Eugene Fisk who blew glass bubbles, broke them into pieces, and then smoothed and polished them into lenses. Thereafter a number of others experimented with various types of contact lenses but the first commercial product was developed by the Zeiss Optical Company of Jena, Germany early in this century. They made both scleral and corneal mono-curved lenses, i. e., lenses with a single continuous curve on each of the front and rear surfaces. A "corneal" contact lens, as distinguished from the now obsolete "scleral" lens covers only the wearer's cornea, the central portion of the eye, and not the sclera which includes the outer portion of the eye as well as the cornea.

In 1929, one Dallas developed a technique for measuring and duplicating the curvature of the eye in a molding process which he used in making scleral lenses. For the next twenty years a great deal of experimentation was done with scleral lenses which had the problem of limited wearing time, one to three hours, before they became uncomfortable. Efforts were made to find a fluid which could be inserted behind the lenses or to develop a fluidless scleral lens which would induce normal eye tears or fluid to circulate underneath the lens. These were formed in two portions with the perimeter matching the curvature of the eyeball and the inner portion which covered the cornea having a curvature which provided a space between the lens and the cornea.

About 1947 Kevin Tuohy developed a plastic corneal lens which was basically

mono-curved but the posterior edges of which were bevelled. Tuohy's lens called for a curve which was slightly flatter, one to three tenths of a millimeter, than the flattest curve of the cornea.

The Tuohy lens, while an improvement over prior types, still resulted in cases of corneal abrasion and was largely supplanted in commercial use by so-called bi-curved corneal lenses.

Plaintiff first made a lens allegedly embodying his construction in the summer of 1948, and first fitted patients with contact lenses embodying it in the fall of 1948. He filed his first patent application on August 1, 1949.

That application was for a corneal contact lens having on its posterior, concave side, two areas of different curvature, the central area being so curved as to follow the curve of the cornea in its central or optical area with the outer or peripheral portion of the lens having a curve flatter than the curve of the cornea in that area thus causing the outer lens surface to diverge from the corneal surface.

The Butterfield patent is the result not of the original application filed August 1, 1949 which was ultimately abandoned but of a second application filed August 1, 1950. This second application was filed after the Patent Office Examiner had rejected all of the claims of the first application as "obviously met" by the corneal lens set forth in either of two articles, one published by Dr. Nugent, an assistant of Tuohy's, in June of 1948, and one by Dr. Graham read publicly before the American Academy of Optometry on December 7, 1948 and published in February 1949.

The Nugent article described a corneal lens having a posterior base curve slightly less sharp than the most curved reading of the cornea and an area of approximately 1.0 mm at the periphery of the posterior surface of the lens "of a flatter radius of curvature than the curvature based on the curvature of the cornea. This bevelled area," Nugent said, "increases the departure of the lens from the cornea at the periphery." As previously indicated, the original Butterfield application was for a corneal lens the curvature of which followed the curve of the cornea in its central or optical area with the outer or peripheral portion having a curve flatter than the corneal curve in the adjacent corneal area.

Without at this point tracing the step-by-step progress of the two Butterfield applications, a patent was granted on the second application on March 6, 1951, and the earlier application was thereafter withdrawn. The Tuohy patent, but not the Nugent and Graham articles, were considered by the Patent Office Examiner before issuing the Butterfield patent although the same examiner had cited all three in considering and rejecting the original claims of the first application.

## THE SCOPE OF CLAIM 1

A threshold question in determining the issue of the validity of Claim 1, the only claim here involved, is its correct interpretation. Three alternative possibilities have been suggested. Dr. Butterfield believes this claim covers any workable bi-curved corneal contact lens. His expert witness, Dr. Mandell, an acknowledged leader in the field, believes it covers any lens having radii of curvature in the central area between 0.1 mm flatter than what is known as "K" to 0.2 mm steeper than "K". The designation "K" derives from the "keratometer," an instrument used to measure the curvature of the central or optical zone of the cornea. Accordingly, a lens is said to be "on K", "flatter than K" or "steeper than K" depending on whether the radius of curvature of the lens corresponds to, is greater than, or is less than the central corneal curve of the eye in question. With respect to the peripheral curve, Dr. Mandel reads no definite limits in Claim 1 on the variation between the lens and the curvature of the adjacent area of the cornea although his professional judgment is that the deviation should be greater in the peripheral area than in the central zone to permit the necessary tear flow between the lens and the cor-

nea, and should be as large as is necessary to enable the lens to be worn continuously and comfortably by the individual patient. Since each eye is different, there is no fixed deviation or even definable range for the peripheral variation in his expert judgment.

The third suggested construction of the claim is to read it literally. The precise language used is "having an inner central spherical area conforming to the corresponding area of the cornea to which the lens is applied" with "the remainder of said inner surface extending radially outward toward the limbus being formed on a curve different from that of said central area and corresponding in curvature with that portion of the corneal peripheral area to which the lens is applied whereby space is provided for the natural uninterrupted circulation of lacrimal fluids between said lens and the cornea."

Before determining the correct interpertation to be given to the claim language, it may be helpful to describe the general characteristics of the human cornea. First, the normal cornea is parabolic in shape, like the end of an egg, although some non-astigmatic corneas may be spherical. This means that the radius of normal curvature gradually lengthens as you reach the periphery of the cornea or, put another way, the periphery is flatter than the central cornea. In addition, it is necessary for the cornea to receive a continuous flow of tears or lacrimal fluid to furnish it oxygen and to dispel the carbon dioxide which is normally exuded by the cornea.

The chronology of the Tuohy and Butterfield applications, as well as the Nugent and Graham publications, is likewise relevant to the question of what Claim 1 of the Butterfield patent was intended by the patent examiner to define and the proper interpretation of the scope of that claim as allowed. Tuohy filed his application on February 28, 1948, Nugent published his paper in June of 1948, Graham delivered his in December 1948, and it was published in February 1949. Butterfield filed his first patent application on August 1, 1949. On February 1, 1950, Examiner Gonsalves rejected all 12 claims of the first application on the basis of the Nugent and Graham articles and the Tuohy application. The Tuohy patent was granted in June 1950. On August 1, 1950, both an amendment to the original Butterfield application and the second Butterfield application were filed in the Patent Office, the latter designated as a continuation in part of the original application. After further office actions on both applications, and the filing of an amendment to the second application on February 6, 1951, the patent in suit was issued on March 6, 1951.

Substantively the foregoing chronology is as follows. On February 28, 1948, Tuohy filed an application for a patent on a plastic corneal lens the posterior side of which was to be slightly flatter, 0.1 mm to 0.2 mm, than "K", the central corneal curvature, so that the lens would diverge from the cornea with a gradually increasing clearance from the center of the lens to its edge. In practice, the so-called Tuohy lens was fit as much as 0.3 mm flatter than the corneal curvature. In addition, the lens described in Tuohy's application had a bevelled edge of undefined width.

In June 1948, Tuohy's medical adviser, Dr. Nugent, described the Tuohy lens as having a posterior base curve slightly less sharp than the most curved reading of the cornea and an area of approximately 1.0 mm at the periphery of the posterior lens surface of a flatter radius of curvature than the base curvature. Dr. Graham in his paper delivered in December 1948 and published in February 1949, described the Tuohy lens similarly and stated that such a lens properly fitted avoided any corneal contact, the lens resting everwhere on a lubricating film of tears. As previously indicated, this optimum result was not always obtained in practice and the Tuohy lens sometimes could not be worn continuously.

In August 1949, Butterfield filed his original application for a lens having two areas of differing curvature on its pos-

terior side, a central area following the curve of the central cornea and a peripheral area of undefined width having a flatter curvature than the corresponding portion of the cornea. No patent issued on this application and all 12 of its claims were rejected by the examiner on the basis of the Nugent and Graham articles and the Tuohy application.

In June 1950, Tuohy was granted a patent on his lens, and on August 1, 1950, Butterfield filed his second application which did not describe the curvature of the central area of the lens as "conforming" to the central area of the cornea or the peripheral area of the lens as "corresponding in curvature" to the peripheral area of the cornea. After a Patent Office action on January 11, 1951 rejecting Claim 1 as filed, an amendment to the application was filed on February 6, 1951 adding those words, and on the next day, February 7, 1951, the examiner allowed the three claims of the patent in suit.

It seems obvious from the foregoing chronology that the reason the Butterfield applications were both first rejected was that their claims as filed described a lens in which the posterior curvature varied from the corneal curvature as did the Tuohy lens, and that a patent issued only after the claims were amended to describe a lens the posterior curvature of which conformed in its central part to the central corneal curvature and the peripheral part of which corresponded in curvature with that portion of the corneal peripheral area to which the lens was applied.

This conclusion is not only the only one consistent with the history of the applications but is also the only one consistent with the language of the claim as allowed. Nowhere in the claim is there any suggestion that Dr. Mandell's interpretation of "conforming" as permitting a variation of up to 0.2 mm between the central lens curvature and that of the central cornea and "corresponding in curvature" as permitting an indefinite deviation between the peripheral lens curvature and that of the peripheral cor-

nea is contemplated by the claim. In this connection, it should be noted that the deviation contemplated by Tuohy was only 0.2 mm from the central corneal curvature so that the deviation Dr. Mandell would read into Claim 1 of the Butterfield patent is as great as that contemplated by Tuohy. In fact, Dr. Mandell would read "conforming" in Claim 1 as covering a lens anywhere between 0.1 mm flatter than "K" and 0.2 mm steeper than "K".

Given the examiner's earlier rejection of Butterfield claims for a lens in which the central posterior area followed the curvature of the central cornea and the peripheral curve was flatter than the curvature of the cornea in that area on the ground that the claims were fully met by Nugent's and Graham's articles describing a lens which did not conform to the corneal curvature at any point, it seems clear that the claims were allowed only when and after they were limited to a corneal lens "conforming" or "corresponding in curvature" to the respective corneal curvatures, central and peripheral. If that is the case, the claim cannot be read as Dr. Butterfield would like, to cover all workable bi-curved corneal contact lenses, or as Dr. Mandell suggests, to cover all bi-curved corneal contact lenses in which the central curvature of the lens is not more than 0.1 mm flatter than "K" or more than 0.2 mm steeper than "K" with no precise limitation on the peripheral deviation but which normally is greater than that of the central area. It may be noted that the difference between Dr. Butterfield's interpretation and that of Dr. Mandell is not as great as at first may appear, since the latter suggests that his interpretation covers the range of variations generally found in successful fitting of contact lenses, i. e., workable contact lenses.

Whether or not Dr. Butterfield is the father of the now widely used bi-curve corneal lens is immaterial. Similarly, it is possible but equally immaterial that the Patent Office Examiner may have erroneously rejected the claims of Dr.

Butterfield's original application which generally described a bi-curved lens of the type now in commercial use. What is material is the language of the claims allowed and the history of the Butterfield applications in the Patent Office as that history sheds light on the meaning of the allowed claims.

As previously delineated, that history is consistent only with the conclusion that Claim 1 defines a lens "conforming" to the central corneal curvature and "corresponding in curvature" to the peripheral cornea curvature. The American Heritage Dictionary of the English Language (1969) defines "conform" as "1, To be in agreement, harmony, or conformity. 2, To be similar or equal (with-to)." It is apparent from these definitions that the operative words of the claims in their ordinary usage connote similarity, not variation or deviation.

We conclude then that whether or not Dr. Butterfield is the inventor of the modern bi-curved lens which in application deviates between 0.1 mm flatter to 0.2 mm steeper in its central curvature from the central corneal curvature and has an even greater deviation in its peripheral area from the peripheral corneal curvature, Claim 1 of his patent clearly does not describe and cover such a lens but rather defines a lens in which the posterior lens curvature is similar to the corneal curvature.

This does not mean that the claim is limited to a lens having curvatures identical to the related corneal curvatures. Since the cornea is normally irregular in shape, it is not technically possible to manufacture a perfectly matching lens. Nor does the claim language so specify. As previously indicated, "conforming" and "corresponding" are synonymous with "similar." The same dictionary defines "similar" as "1. Showing some resemblance; related in appearance or nature; alike though not identical." Accordingly, we conclude that the claim language covers any lens designed, so far as is technically possible, to match the cornea to which it is to be applied. It does not, however, cover a lens which is deliberately designed, as is the modern contact lens, to deviate from the corneal curve, with a greater deviation in the peripheral area than in the central area.

## VALIDITY

Having determined the scope of the claim in issue, we come to the question of its validity. We start, of course, with the statutory presumption of validity, 35 U.S.C. § 282, and the burden of establishing invalidity rests, pursuant to the same statutory provision, on the party asserting it.

Defendants contend that the claim in issue, as we have interpreted it, is invalid because (1) a lens made in conformity therewith would be inoperative, (2) lenses so made were in public use and on sale more than one year before the patent application was filed under which the patent was granted, and (3) the claim as amended and finally allowed embodied new matter illegally introduced into the application by amendment.

In support of their first contention, defendants emphasize, as we have already noted, that a modern contact lens is deliberately designed to have a clearance, particularly in its peripheral area, between the lens and the cornea. Plaintiff's expert, Dr. Mandell, described the reason for such clearance as follows:

A pool of tears collects beneath the peripheral curve. As the lens is rocked back and forth by the action of the lids, the tears are passed under the central portion of the lens. In this manner the lids and lens work together as a pump and constantly circulate tears across the cornea.

A lens made to achieve this effect obviously may not have a peripheral curvature, in the language of the claim, "corresponding in curvature with that portion of the corneal peripheral area to which the lens is applied" notwithstanding the subsequent explanatory language "whereby space is provided for the natural uninterrupted circulation of lacrimal fluids between said lens and the cornea."

All the evidence before the Court indicates that only a lens which deviates, does not correspond, in peripheral curvature with the curvature of the related portion of the cornea will achieve that result.

Dr. Butterfield himself was explicit in rejecting conformity as the objective. He stated, "The cornea is not perfectly spherical. It is very irregular. Therefore, to use a word like exact conformity, the lens would not be wearable. That is not what anybody wants in fitting contact lenses at any time, except the old scleral lens where we had to get conformity to hold the fluid inside of the lens."

Dr. Butterfield's son explained that the principal source of complaint in the wearing of contact lenses arises when the secondary curve is not flat enough which is cured by flattening the peripheral curve either to create a gap between the peripheral area of the lens and the cornea or to make the existing gap larger. In either event, it is clear that there must be a flatter peripheral curve on the lens than the curve of the related portion of the cornea.

In this connection, Dr. Mandell indicates that the extent of the deviation in the peripheral area to make the lens wearable varies from patient to patient and no definite limitation or formula therefor can be expressed. This undoubtedly explains, in part at least, why the Tuohy lens which was basically monocurved with a 0.1 mm bevelled outer perimeter worked on some eyes but not on all. It simply was not flexible enough to deal with all the variations found in the human eye. In any event, it is undisputed that a lens which has a peripheral curvature "corresponding in curvature with that portion of the corneal peripheral area to which the lens is applied" is unwearable.

■ The statutory definition of what is patentable is "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. While the determination of the utility of an invention is not always possible, the courts have generally held that when the invention is clearly not useful, no valid patent for it may issue. See Brenner v. Manson, 383 U.S. 519, 86 S.Ct. 1033, 16 L.Ed.2d 69 (1965); Coupe v. Royer, 155 U.S. 565, 15 S.Ct. 199, 39 L.Ed. 263 (1895); Amphenol Corp. v. General Time Corp., 397 F.2d 431 (C.A.7, 1968).

■ It is undisputed that a wearable contact lens must have a curvature, particularly in its peripheral area, flatter than the corneal curvature, and that a lens which conforms with or corresponds to the corneal curvature is not wearable. The conclusion is inescapable that a lens meeting the description of Claim 1 is not useable. It follows then that no valid patent could issue thereon and Claim 1 is invalid.

The defendants also urge that the claim is invalid because lenses so made were in public use and on sale more than one year prior to August 1, 1950 when the second application was filed on which the patent was granted. The plaintiff responds that the second application was a continuation in part of the earlier one filed August 1, 1949, and the one year provision of 35 U.S.C. § 102(b) is therefore no bar.

Inasmuch as Claim 1, as we read it, describes an unworkable lens, it seems obvious that it was not in public use or on sale for a period of more than one year prior to August 1, 1950. So far as the record before the Court discloses, bi-curved conforming corneal lenses were never in public use although it may be that at some stage in the developmental experimentation such lenses may have been tried.

Given the confused history of the two Butterfield applications in the Patent Office, it is difficult to determine whether the second application was a continuation in part of the first or not. What apparently happened was that Dr. Butterfield changed patent counsel after all the claims in his first application were denied and the new patent counsel decided both to file an amendment to the

original application and to file a second application. As previously indicated, the second application, as filed, did not include the "conforming" and "corresponding" language and the examiner by a Patent Office action tentatively rejected the claims of the original application as amended and of the second application. After Butterfield's new patent counsel conferred with the examiner, he filed an amendment to the second application on February 6 adding those words and the next day, February 7, the examiner allowed the three claims of the patent in suit. Subsequently, the original application was withdrawn.

■ We conclude that the second application, as filed, was a continuation in part of the original application although the claims as granted describe a substantially different lens than shown in the original application.

■ This brings us to the defendant's third contention, that the addition of the "conforming" and "corresponding" language involved the introduction of new matter in violation of what is now 35 U.S.C. § 132 which prohibits introduction of new matter into the disclosure of the invention by amendment. As we view the history of the two applications, Dr. Butterfield in both originally sought a patent on a bi-curved lens which did not "conform" or "correspond" to the corneal curvature. The subsequent amendment adding those characteristics was a substantial modification of the description of his invention and apparently, as we have previously discussed, the condition precedent required by the Patent Examiner before he would permit a patent to issue.

In addition to adding the concept of a lens "conforming" or "corresponding in curvature" to the corneal curvature, the amendment also added with respect to the central corneal area "so that undue pressure will not be present at any point" and with respect to the peripheral area "whereby space is provided for the natural uninterrupted circulation of lacrimal fluids between said lens and the cornea."

While these phrases simply describe the purpose of the construction and not the patented device, they represent a new and different objective than that stated in the original application.

It seems clear, therefore, that the amendment did introduce new matter into the disclosure of the invention in violation of 35 U.S.C. § 132 and the patent is invalid for that reason as well. Hazeltine Research, Inc. v. Zenith Radio Corporation, 388 F.2d 25 (C.A.7, 1967).

■ Plaintiff urges, as we have indicated, that notwithstanding the language of Claim 1, it should be interpreted to cover corneal contact lenses which differ in curvature from the corneal curvature. Defendants contend that, even if so interpreted, the patent is invalid because of the violation of 35 U.S.C. § 132, as just discussed, and, in addition, because anticipated by the Tuohy patent and the Nugent and Graham articles, and because the claim is so vague and indefinite as not to inform the public of the limits of the monopoly claimed. In this connection, they point out that plaintiff's expert, Dr. Mandell, when asked by the Court whether the lens described by Nugent in his article was "a Tuohy or Butterfield lens" answered, "Well it is both."

The Court agrees with Dr. Mandell's candid answer. What obviously was happening in the evolution of functioning and wearable plastic contact lenses, was that the developers were learning that the peripheral curve of the lens had to deviate from the related corneal curve so as to permit lacrimal circulation and the pumping action described by Dr. Mandell previously referred to herein.

While we do not reach the question of the validity of the Butterfield patent if interpreted to describe a non-conforming lens, it seems apparent that he was not the first to recognize the desirability of having a lens which deviated in its peripheral curve from the curvature of the cornea in that case. Moreover, as was apparent from the testimony at the trial, the description set forth in Claim 1

does not define, as Dr. Mandell did, the permissible range of deviation between the lens and corneal curvatures in both the central and peripheral areas. Even if the claim be read to cover any bi-curved lens which works, it certainly does not define the characteristics of such a lens in terms which would enable a practitioner to make a wearable lens. It would appear then that Claim 1 is invalid, even if read as plaintiff urges.

## ESTOPPEL

In connection with the issue of invalidity, plaintiff contends that defendant Plastic Contact Lens Co. and its licensees are estopped to assert the defense of invalidity by virtue of a consent agreement entered into between Plastic and plaintiff in an action in the District of Oregon, entitled, "Solex Laboratories, Inc. and Plastic Contact Lens Co., Plaintiffs, v. George H. Butterfield, Sr. and George H. Butterfield & Son, Defendants, 60–107." The consent judgment in question was entered in April 1962, and recited that both the Tuohy patent, then owned by Plastic, and the Butterfield patent were valid. Plastic had previously obtained a license under the Butterfield patent. In its licensing of manufacturers of contact lenses under the Tuohy patent, Plastic agreed to indemnify its licensees, including defending any action brought against a licensee for alleged infringement of the Butterfield patent and paying 85 per cent of any damages which might finally be awarded in any such action.

On the basis of the foregoing facts, plaintiff urges that Plastic is estopped from challenging the validity of the Butterfield patent. He also contends that, because of the indemnity provisions of Plastic's licensees under the Tuohy patent, all of the licensees who are defendants herein are also estopped from contesting the validity of plaintiff's patent, since Plastic, not they, is the real party in interest.

Dealing first with the question of whether or not Plastic is estopped, it is clear that prior to Lear, Inc. v. Adkins, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), quite apart from the consent judgment, Plastic as a licensee would have been estopped to attack the validity of plaintiff's patent. Neither the Supreme Court nor our Circuit has had occasion to consider the question of estoppel by agreement or consent judgment post-*Lear*. We have done so, however, in Kraly v. National Distillers & Chemical Corp., 319 F.Supp. 1349 (N.D.Ill. 1970). As discussed there, the value judgment involved concerns two public policies: (1) the undesirability, discussed in *Lear*, of having licensees and the public pay royalties to one who does not have a valid patent; and (2) the desirability of encouraging settlements of lawsuits. We concluded in *Kraly* that the former outweighed the latter. That conclusion seems even more appropriate here. In the consent judgment entered in the *Oregon* case, the plaintiffs acknowledged the validity of the Butterfield patent and the defendants acknowledged the validity of the Tuohy patent. If all were estopped from challenging the validity of both patents, the result would be that the parties having the greatest economic interest in the patents would be foreclosed from ever asserting their invalidity. If Plastic's licensees are likewise estopped, as plaintiff contends, then the likelihood of anyone ever challenging either patent is even more materially reduced. While we do not suggest that there was any collusion in the consent judgment here involved, the potential for abuse is obvious and the public damage which could result is equally apparent.

We see no reason why the public should be exposed to paying royalties on an invalid patent. For this reason, we have consistently in the past refused to sign consent decrees or judgments in patent cases containing a finding that the patent involved was valid or that it had been infringed by the defendant. We believe that the validity of a patent should not be removed from challenge by agreement of parties who have an economic interest in it by virtue of being its

owner or a licensee under it. As we read *Lear*, as well as the implications of Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation et al., 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), the public interest is the paramount consideration.

■ We conclude then that neither Plastic nor its licensees are estopped from challenging the validity of the Butterfield patent in the instant actions. In this connection the licensees, while indemnified by Plastic to the extent of the costs of defending the actions and 85 per cent of any judgment for royalties during the license period are not without risk both as to any royalties payable for the eight months between the expiration date of the Tuohy patent when the licenses also expired and the later expiration date of the Butterfield patent, as well as 15 per cent of any damages attributable to the period during which the indemnification agreement was in effect. Accordingly, since they were not parties to the consent judgment, we do not believe they are estopped from asserting the invalidity of the Butterfield patent whether or not Plastic is.

## MARKING AND NOTICE

■ As indicated at the outset, in addition to the issue of validity, there are before the Court the questions of whether articles made under the Butterfield patent by plaintiff were either marked as required by 35 U.S.C. § 287, or whether defendants herein were, prior to institution of suit against them, given notice of their alleged infringement in compliance with the provisions of that same section. The section in question requires as to marking either that the patented article itself be marked with the patent number or, if this is not possible because of the character of the article, that the package in which one or more of the patented articles is contained be so marked. The record reveals that an appropriate reference to the Butterfield United States patent number 2,544,246, was set forth on each invoice for a lens manufactured by George H. Butterfield & Son. Plaintiff urges that this constitutes sufficient marking under the statute. Defendants insist that the invoices sent to customers of plaintiff, local opticians, optometrists, etc., would not constitute notice to the public, the ultimate consumers, and is not, therefore, sufficient. Plaintiff also established that a rubber stamp was provided each of its licensees which read: "These semi-final lenses sold only to be finished to conform to U. S. patent 2,544,-246 and/or Canadian patent 487,880." Defendants counter by pointing out that no evidence was introduced that these rubber stamps were ever used by licensees to mark the containers ultimately delivered to purchasers and there is no evidence that plaintiff required that they be used or inquired if they were.

In determining whether or not plaintiff met the marking requirement of 35 U.S.C. § 287, it is necessary to understand the mechanics of distribution involved. Plaintiff is a manufacturer of semi-finished lenses which are made to specifications provided by the local optometrist, optician, etc. The latter, upon receiving them from plaintiff, adjusts and processes them further to fit the particular customer's eyes and delivers them ultimately in his own container. Plaintiff could have insisted and required that this container be marked with the patent number and some of its license agreements contained such a requirement although many did not. In either event, plaintiff did nothing to assure that the containers were so marked when delivered to the user and there is no indication that they were.

While we recognize the difficulties inherent in controlling the conduct of customer-licensees, we conclude that plaintiff did not make a reasonable effort to do so. As a result, it does not appear from the record that any ultimate purchaser from plaintiff or its licensees received lenses in containers bearing the required marking. The purpose of the statute was obviously not accomplished.

With respect to the question of notice, the facts are that three of the defendants

admittedly received adequate notice of infringement. These defendants and the dates of notice are Calcon Laboratories, December 5, 1964; Contour Comfort Contact Lens, Inc., July 1, 1965; and Reese Optical Co., Inc., October 5, 1965. Thirteen other defendants received a letter from Dr. Butterfield which referred to the patent and the previous offers of licenses thereunder which he had given to corneal lens manufacturers. Thereafter the letter read:

"To those who have not (taken licenses), and whom I have good reason to believe are infringing, I feel that I should give this formal written notice of the patent so that they might avoid innocent continuance of the infringement."

Plaintiff urges that this paragraph meets the notice requirements of 35 U.S.C. § 287 which provides in pertinent part that " * * * no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter. * * * " Defendants, on the other hand, insist that the letter notice was insufficient in that it failed unequivocally to accuse the putative defendant of infringing the Butterfield patent, citing Smith v. Dental Products Co., 140 F.2d 140 (C.A.7, 1944), cert. den. 322 U.S. 743, 64 S.Ct. 1146, 88 L.Ed. 1576.

■ While the letter in question might have been more aggressively worded, we believe that it clearly identified the patent as well as indicating Dr. Butterfield's belief that the addressee was infringing it. In *Dental Products*, the letter simply asserted that the writer "has very broad patent protection" without identifying the specific patent or patents in question. This failure, it was held, made the notice inadequate even though the Court agreed that the recipients undoubtedly knew which patents were involved. Here, the numbers of the United States and Canadian Butterfield patents were set forth specifically. Accordingly, *Dental Products* is inappropri-

ate and the defendants who received the October 5, 1965 letter received the statutory notice.

■ Some of the defendants did not receive the letter in question but were licensees of Plastic under the Tuohy patent as previously discussed. As to all Plastic licensees, whether or not they received the October 5, 1965 letter, plaintiff contends that notice to Plastic by virtue of the Oregon suit constituted notice to all of its licensees. In support of this conclusion plaintiff urges that a patent licensee is in privity with his licensor and notice to the latter therefore constitutes notice to the former. None of the cases cited by plaintiff, however, establishes that broad generalization. There certainly can be factual situations in which a licensor and licensee may be in privity but it does not follow that they always are. Nor does the fact that Plastic agreed to indemnify licensees under the Tuohy patent if they were charged with infringing the Butterfield patent constitute notice that Dr. Butterfield considered them to be infringers of his patent. Unless the Butterfield patent covered lenses made as specified in the Tuohy patent, in which event it would clearly be invalid since Tuohy is earlier, a Tuohy licensee might, absent notice from Butterfield to the contrary, believe that his lenses made in confomity with Tuohy's teachings did not infringe the Butterfield patent. Absent notice from Butterfield himself, we find no basis for concluding that Tuohy licensees of Plastic had notice that they were infringing the Butterfield patent.

CONCLUSION

In summary, we hold that the Butterfield patent, No. 2,544,246, calls for a bicurved corneal lens, the central curve of which conforms to the curvature of the central area of the cornea with a peripheral curve corresponding in curvature to that of the peripheral area of the cornea. Since such a lens is concededly unwearable and useless, we find the patent to be invalid. We also find that, in striving to obtain a patent, plaintiff's

counsel introduced new and significantly different matter into the disclosure of the invention by amendment in violation of 35 U.S.C. § 132.

On the question of whether defendant Plastic Contact Lens Co, and its licensees who are defendants are estopped from challenging the validity of the Butterfield patent in these actions, we hold that they are not.

With respect to the requirements of 35 U.S.C. § 287 as to marking the patented product or its container or giving notice of infringement before suit may be maintained, we find that the plaintiff did not take reasonable steps to assure that the requisite marking was done by his licensees and that neither the lenses sold by him or by his licensees or their containers were marked with the patent number. Certain of the defendants received notice from plaintiff that they were infringers. These include the three who concede that they received adequate notice, as well as the thirteen others who were sent the letter of October 5, 1965. The others did not.

An order consistent with all of the foregoing will enter.