**HORMONE RESEARCH FOUNDATION and Hoffmann–LaRoche, Inc., Plaintiffs,**

**v.**

**GENENTECH, INC., Genentech Development Corporation and Genentech Clinical Partners, Ltd., Defendants.**

**No. C–86–5201 MHP.**

United States District Court, N.D. California.

Aug. 4, 1988.

S. Leslie Misrock, Gidon D. Stern, Pennie & Edmonds, New York City, Stephen V. Bomse, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for plaintiffs.

Roland N. Smoot, James W. Geriak, Douglas E. Olson, Coe A. Bloomberg, Lyon & Lyon, Los Angeles, Richard Haas, Lasky, Haas, Comler & Munter, San Francisco, Cal., for defendants.

## MEMORANDUM AND ORDER

PATEL, District Judge.

Plaintiffs Hormone Research Foundation and Hoffmann–LaRoche, Inc., filed suit against defendants Genentech, Inc., Genentech Development Corporation and Genentech Clinical Partners, Ltd. ("Genentech"), alleging that Genentech's human growth hormone product, Protropin, infringes Patent No. 3,853,833. The action is now before the court on three cross-motions for partial summary judgment, as well as plaintiffs' motion to preclude reliance upon the uncompleted deposition of Dr. Li and plaintiffs' ex parte application for a five-month extension of pretrial and trial dates. After consideration of the memoranda and supporting documents submitted by the parties and the arguments of counsel, the court grants defendants' first and third motions for summary judgment, denies defendants' second motion for summary judgment and all of plaintiffs' cross-motions, and declines to address plaintiffs' motions to preclude reliance on the deposition of Dr. Li and for a five month extension of pretrial and trial dates.

## BACKGROUND

In 1971, Dr. Li thought he had identified the correct structure of and developed a process for synthesizing human growth hormone ("HGH"). He filed for and obtained, after some amendment and argument, Patent No. 3,853,833 ("the '833 patent"), claiming the method by which he synthesized the substance he thought was HGH, the substance itself and substances produced by the specified method. Li used an established protein synthesis process known as "solid phase peptide synthesis" to construct the complex amino acid structure he thought was HGH. It was later discovered that the structure Li identified as HGH in Figure 2 of the '833 patent ("Fig. 2") differed from the natural structure in several respects.

Genentech produces an HGH product which it calls Protropin. Because of the differences between natural HGH and Fig. 2, Protropin differs from the structure identified in Li's Fig. 2 in that it contains two additional proteins (192 instead of 190) and has slightly different proteins in the positions corresponding to positions 73 (glutamic acid rather than glutamine), 106 (aspartic acid rather than asparagine) and 108 (asparagine rather than aspartic acid) of the protein sequence shown in Fig. 2.[1]

---

1. Genentech also has pending before the Food and Drug Administration a licensure application for a product called Protropin II, which is identical to Protropin except that it contains only one of the two additional amino acids contained in Protropin but not in Fig. 2. Compared to Fig. 2, Protropin and Protropin II both contain an additional glutamine after position 68; Protropin also contains an additional methionine at the amino terminus. The additional terminal

*See* Meier Dec.Ex. A, '833 Patent at Fig. 2; Ex. B, Meier Dec.Ex. B, Defendants' Responses to Plaintiffs' Interrogatories Nos. 1 through 39 at 2; Meier Dec.Ex. D, *Direct expression in Escherichia coli of a DNA sequence coding for human growth hormone* at 3.

In addition, the development of recombinant DNA techniques for synthesizing proteins made it possible to produce and isolate HGH in marketable quantities for use in the treatment of humans with growth deficiencies. Protropin is produced by the recombinant DNA process rather than the solid phase peptide synthesis method used by Li and described in the specification of his patent.

Plaintiffs Hormone Research Foundation, the owner of the Li patent, and Hoffman–LaRoche, the exclusive licensee under the Li patent, filed this action against Genentech claiming that Genentech is infringing the Li patent by conducting clinical trials on, seeking federal approval for, and making, using and selling Protropin. Plaintiffs seek both injunctive and monetary relief. In response to Defendants' Interrogatory No. 22, plaintiffs identified eight claims of the Li Patent which they contend are infringed by Genentech: claims 1, 3, 11, 12, 17, 18, 20 and 25.

PATENT CLAIMS ALLEGEDLY INFRINGED

The eight patent claims allegedly infringed by Genentech may be described as follows:

Claim 1 claims a "method of producing synthetic human pituitary growth hormone which comprises" three general steps, the first of which involves forming an amino acid chain "in the sequence of natural human pituitary growth hormone";

Claim 3 claims a "method of producing a substance having growth-promoting activity which comprises" the same three steps as in claim 1 except the first step requires that the chain be formed "in a sequence corresponding to FIG. 2 or 3 of the accompanying drawing";

Claim 11 is identical to claim 3 except the first step requires forming a chain "corresponding to (i) the portion of the sequence in FIG. 2 of the drawing from positions 86 to 190 or (ii) the said portion (i) combined with any fraction of the remaining portion from position 85 to position 1";

Claim 12 claims a "composition of matter consisting essentially of a synthetic, biologically active substance which has a structure corresponding to FIG. 2 of the accompanying drawing";

Claim 17 is identical to claim 12 except the structure must correspond to "(a) the portion of the structure of FIG. 2 of the drawings from positions 86 to 190 or (b) the said portion (a) combined with any fraction of the remaining portion from position 85 to position 1";

Claim 18 claims a "composition of matter produced in accordance with the method of claim 1";

Claim 20 claims a "composition of matter produced in accordance with the method of claim 3";

Claim 25 claims a "composition of matter produced in accordance with the method of claim 11."

Meier Dec.Ex. A, '833 Patent at cols. 11–14.

LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ... since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). *See also T.W. Elec. Serv. Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987) (the nonmoving party may

---

methionine in Protropin is not present in natural HGH; advances in DNA technology allowed Genentech to eliminate the additional methionine in Protropin II. *See* Exhibits in support of plaintiffs' opposition to defendants' third motion for summary judgment, Ex. L at 2 n. 2. All analysis in this memorandum applies to both Protropin and Protropin II.

not rely on the pleadings but must present specific facts creating a genuine issue of material fact); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."). The inferences to be drawn from the facts must be viewed in a light most favorable to the party opposing the motion. *T.W. Elec. Serv.,* 809 F.2d at 631.

Summary judgment is appropriate in a patent case, as in any other case, where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Townsend Engineering Co. v. Hitec Co.,* 829 F.2d 1086, 1089 (Fed. Cir.1987). Because infringement is a question of fact, however, the court should approach a motion for summary judgment as to infringement "with a care proportioned to the likelihood of its being inappropriate." *D.M.I., Inc. v. Deere & Co.,* 755 F.2d 1570, 1573 (Fed.Cir.1985).

DISCUSSION

The parties have filed three cross-motions for partial summary judgment on the issues of (1) whether Genentech has infringed the claims in the Li patent that refer specifically to Fig. 2; (2) whether Genentech has infringed the claims in the Li patent that refer to the synthesis method used; and (3) whether the claims in the Li patent allegedly infringed by Genentech are invalid because they do not enable the making and using of the claimed invention. In addition, plaintiffs have filed a motion to preclude reliance upon the uncompleted deposition of Dr. Li and an ex parte application for a five-month extension of pretrial and trial dates.

I. *First Motion for Partial Summary Judgment*

Genentech's first motion for partial summary judgment seeks a determination that defendants do not infringe claims 3, 11, 12, 17, 20 and 25 ("the Fig. 2 claims") of the Li patent because Protropin does not contain a compound having the structure of Fig. 2 in the Li patent or of a fragment of Fig. 2

as described in claims 11 and 17. Independent claims 3, 11, 12 and 17 refer specifically to Fig. 2, and claims 20 and 25 depend from claims 3 and 11, respectively, which refer to Fig. 2. Plaintiffs' cross-motion seeks a determination that the scope of the Fig. 2 claims is not limited, either by the language of the claims or the prosecution history of the patent, to structures identical to Fig. 2.

A. Literal Infringement

Literal infringement is found when "properly interpreted claims read on the accused product or method." *Moleculon Research Corp. v. CBS, Inc.,* 793 F.2d 1261, 1269–70 (Fed.Cir.1986). While literal infringement itself is an issue of fact, the preliminary step of claim interpretation is a matter of law. *Id.* at 1270. Defendants argue that the Fig. 2 claims, properly interpreted, cannot as a matter of law be found literally to encompass defendants' HGH products because those products do not contain any substance having the exact structure of Fig. 2 or of the portion of Fig. 2 from positions 86 to 190.

The structure of Genentech's synthetic HGH is identical to neither the entire Fig. 2 structure nor a structure described by claims 11 and 17 consisting of the active portion of Fig. 2 (positions 86–190) combined with any fraction of the remaining, inactive portion of Fig. 2 (positions 85–1). Instead, Genentech's synthetic HGH is lengthier than the structure described by Fig. 2, containing two additional amino acids (in the case of Protropin II, one additional amino acid), and otherwise differs in three positions as described above. Two of those differences fall within the active portion of Fig. 2 (the substitution of aspartic acid for asparagine at position 106 and asparagine for aspartic acid at position 108).

▆▆▆ Plaintiffs argue that Genentech's Protropin products literally infringe the Fig. 2 claims because those claims include broadening language that extends their literal scope to encompass Genentech's product. Plaintiffs contend that as a matter of established patent law, "corresponding"

means "similar" rather than "identical," and the terms "comprises" and "consisting essentially" open the claims to the inclusion of additional ingredients.

Each of the independent Fig. 2 claims refers to a sequence of amino acid residues "corresponding to" all or some portion of Fig. 2.[2] The words of a patent claim should be given their ordinary meaning unless it appears the patentee intended to give the words some different meaning. *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 759 (Fed.Cir.1984). The first definition for "corresponding" given by the Random House College Dictionary (1982) is "identical in all essentials or respects," and the associated example is "corresponding fingerprints." Fingerprints, like sequences of amino acids, can be described and compared with an extremely high level of scientific precision; any tiny difference importantly distinguishes one fingerprint from another.

While the same dictionary secondarily defines "corresponding" as "similar in position, purpose, form, etc.," the example associated with that definition is "corresponding officials in two states." This secondary definition of "corresponding" is commonly applied, consistent with the dictionary example, to situations lacking the high degree of technical comparability present in fingerprints and amino acid sequences. The court therefore holds that the ordinary meaning of "corresponding," when used to refer to an item as specific and precise in its technical detail as Fig. 2, where "[m]erely the change in location of one amino acid group ... would alter the structure," Killion Aff.Ex. A, Ex. 2 to Li Depo., Amendment Sept. 12, 1973 at 5, is "identical" rather than "similar."

There is no evidence that the patentee intended "corresponding" to carry any extraordinary meaning. Plaintiffs' remaining argument must therefore be based on a claim that within patent law, "correspond-

ing" is a term of art meaning "similar." Plaintiffs cite *Butterfield v. Oculus Contact Lens Co.*, 332 F.Supp. 750, 757 (N.D. Ill.1971) for the proposition that "corresponding" is synonymous with "similar" when used in a patent claim. Plaintiffs fail to mention, however, that the *Butterfield* court specified that "the claim language ['corresponding in curvature'] covers any lens designed, *so far as is technically possible,* to match the cornea to which it is to be applied" but does *not* cover "a lens which is deliberately designed ... to deviate from the corneal curve." *Id.* (emphasis added).

Genentech's Protropin products are not designed to match Fig. 2 as closely as technically possible; instead, they are deliberately designed to deviate from Fig. 2 as described above. *Butterfield* thus fails to support plaintiffs' argument that the word "corresponding" in the Fig. 2 claims extends their literal scope to encompass the accused products. Instead, *Butterfield* is consistent with the ordinary meaning of "corresponding" as set forth above: In the context of precise scientific applications, "corresponding" means as close to identical as is technically possible.[3] Consequently, the court holds that Genentech's synthetic HGH does not have a structure corresponding to the structure of Fig. 2.

Each of the independent Fig. 2 method claims contains the transitional phrase "which comprises" and each of the independent Fig. 2 composition claims contains the phrase "consisting essentially of." Plaintiffs correctly state that those phrases, as a matter of patent law, open the claims to the inclusion of additional steps (in a method claim) or ingredients (in a composition claim). *See Moleculon*, 793 F.2d at 1271; *Atlas Powder Co. v. E.I. Du Pont De Nemours & Co.*, 750 F.2d 1569, 1573 (Fed.Cir. 1984). Genentech's products do not, however, simply involve method steps addition-

---

**2.** Dependent claims 20 and 25 incorporate the limitations of claims 3 and 11, from which they depend.

**3.** The other two cases cited by plaintiffs besides *Butterfield* in support of their interpretation of "corresponding," *Lockheed Aircraft Corp. v.*

*Rathman,* 106 F.Supp. 810 (S.D.Cal.1952), and *Frito–Lay, Inc. v. So Good Potato Chip Co.*, 540 F.2d 927 (8th Cir.1976), did not involve patent law and therefore carry no particular weight in determining legal meaning.

al to those listed in claims 3 and 11 or ingredients additional to the substances specified by claims 12 and 17. Because the structure of Genentech's synthetic HGH does not correspond to the structure of Fig. 2, one of the steps in each of the method claims is *different* from the analogous step used in the production of Protropin and Protropin consists essentially of a substance that is *different* from the substances specified in the composition claims. The transitional phrases "which comprises" and "consisting essentially of" cannot expand the literal scope of the Fig. 2 claims to encompass products that do not contain any substance corresponding to Fig. 2.

Plaintiffs further argue that Genentech's products literally infringe claims 11, 17 and 25 because defendants' synthetic HGH contains a sequence of amino acid residues identical to the active portion of Fig. 2 (positions 86–190). As noted above, the only difference between the latter portion of Genentech's HGH sequence and the active portion of Fig. 2 is the reversal of the asparagine located at position 106 of Fig. 2 and the aspartic acid located at position 108. Claims 11, 17 and 25 incorporate Fig.2 by reference; Fig. 2 uses the symbol "Asn" to represent asparagine and "Asp" to represent aspartic acid. Meier Dec.Ex. A at col. 4. To determine that the segment of defendants' synthetic HGH containing the last 105 amino acid residues was identical to the active portion of Fig. 2, the court would thus be required to construe the claims as attributing the same meaning to the symbols "Asn" and "Asp."

Such an interpretation would be inconsistent with the patent specification, which may be used to construe the claims. *See SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1118 (Fed.Cir.1985). A table listing the differences between the structure depicted by Fig. 2 and the structure depicted by Fig. 3 appears in Column 6 of the specification. Meier Dec.Ex. A, '833 Patent at col. 6. Line 19 of that table indicates that one of the differences between Fig. 2 and Fig. 3 is the presence of "Asn" at position 106 in Fig. 2 and "Asp" at position 106 in Fig. 3. Because the specification defines "Asn" as different

from "Asp," plaintiffs' argument that defendants' products literally infringe claims 11, 17 and 25 fails.

Finally, plaintiffs argue that there is literal infringement because all the differences between defendants' products and Fig. 2 are inconsequential. They point out that one of defendants' products contains only "one additional amino acid" compared to Fig. 2. Plaintiffs argue that the other differences between defendants' products and Fig. 2 are immaterial because asparagine is interchangeable with aspartic acid and glutamine with glutamic acid. Besides conflicting with the specification as described above, this argument is disingenuous for it is the very presence of $NH_2$ and COOH in amino acids that makes it possible for them to join together and form polypeptide chains. The loss of OH from COOH and H from $NH_2$ is critical to forming a peptide bond. Thus, for example, asparagine, whose carbon atom has the grouping $CH_2$ $CONH_2$ attached to it, is not interchangeable with aspartic acid, whose carbon atom has $CH_2$ COOH attached to it. The properties are different and in chemical structures as sensitive as these the literal infringement showing must be exacting.

The court thus concludes that the Fig. 2 claims as properly interpreted do not encompass the accused products within their literal scope.

## B. Doctrine of Equivalents

Even if an accused product is not literally encompassed by the words of a claim, the accused product may be found to infringe under the doctrine of equivalents if "the accused product and claimed invention perform substantially the same function in substantially the same way to yield substantially the same result." *Atlas Powder*, 750 F.2d at 1579 (citing *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608–09, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950)). The doctrine of patent prosecution history estoppel limits the application of the doctrine of equivalents, however, by barring a patentee "from construing its claims in a way that would resurrect

subject matter previously surrendered during prosecution of the patent application." *Mannesmann Demag Corp. v. Engineered Metal Products Co., Inc.*, 793 F.2d 1279, 1284 (Fed.Cir.1986). While infringement under the doctrine of equivalents is a question of fact, the application of prosecution history estoppel to limit the range of equivalents that may be asserted by the patentee is a question of law. *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 869–70 (Fed.Cir.1985).

Prosecution history estoppel applies both to "claim amendments to overcome rejections based on prior art and to arguments submitted to obtain the patent." *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1362 (Fed.Cir.1983) (citations omitted). Amendment or argument to overcome the rejection of a claim by the patent examiner does not prevent the application of the doctrine of equivalents, but it may limit as a matter of law the range of equivalents which may be asserted. *Id.* at 1363. Determining the scope of a prosecution history estoppel resulting from actions taken before the Patent and Trademark Office ("PTO") requires an examination of the amendments or arguments, the prior art distinguished, the patent examiner's objections overcome by the actions, and any other relevant facts and circumstances. *Mannesmann*, 793 F.2d at 1284–85.

Genentech contends that amendments and arguments made before the PTO create a prosecution history estoppel preventing plaintiffs from asserting a range of equivalents for the Fig. 2 claims that would encompass the accused products. Genentech bases its prosecution history estoppel argument primarily on arguments concerning application claim ("A-claim") 18, which eventually issued as patent claim 15. *See* Killion Aff.Ex. A, Ex. 2 to Li Depo., Patent Application No. 162,946 at p. 27.[4] A-claim 18 depended from A-claim 12, which issued as patent claim 12 after amendment. Pat-

ent claim 15 is not at issue in this litigation but plaintiffs have alleged infringement of patent claim 12.

■ As noted above, prosecution history estoppel may apply where an applicant has surrendered subject matter coverage by arguing a narrow claim construction to the PTO. *Slater Elec., Inc. v. Thyssen–Bornemisza Inc.*, 650 F.Supp. 444, 451 (S.D.N.Y.1986); *see Hughes*, 717 F.2d at 1362. Genentech contends that statements made before the PTO in order to overcome the examiner's rejection of A-claim 18 create a prosecution history estoppel barring plaintiffs from asserting that the Fig. 2 claims are entitled to a range of equivalents encompassing substances whose chemical structures are similar but not identical to Fig. 2. Plaintiffs counter with the arguments that prosecution history estoppel does not apply because (1) the statements at issue were not directed to any of the Fig. 2 claims; (2) all the Fig. 2 claims were already allowed over the prior art at the time the statements were made; and (3) plaintiffs are not trying to recapture through the doctrine of equivalents any subject matter surrendered by the statements before the PTO.

■ The Federal Circuit has rejected the proposition that, as a matter of law, limitations applied to secure the patentability of particular claims during prosecution may not be used to limit other claims. *Builders Concrete, Inc. v. Bremerton Concrete Products Co.*, 757 F.2d 255, 260 (Fed.Cir.1985). The court in *Builders Concrete* held that although only a single claim was in suit, "the prosecution history of all claims is not insulated from review in connection with determining the fair scope" of the claim in suit. *Id.* While the context in which particular statements or amendments were made, and the claims to which they were directed, must be considered in determining the existence and scope of any

---

**4.** The documents constituting the prosecution history of the '833 patent before the Patent and Trademark Office are contained in chronological order in Exhibit 2 to Volume 1 of the Li deposition, which was filed as Exhibit A to the Affidavit of Robert E. Killion. Those prosecu-

tion history documents will hereinafter be cited by the title, date and internal page number of the document, preceded by the identifier "PH—" (e.g., "PH—Office Action Aug. 8, 1972 at 3" or "PH—Amendment Sept. 12, 1973 at 5").

estoppel effect, there is no formal bar to consideration of the meaning and effect of actions taken before the PTO with regard to claims not in suit.[5]

Similarly, there is no general rule of law that amendments or arguments made in support of one claim cannot affect the scope of another claim already allowed at the time the amendments or arguments were made. While a court may determine, given the words of the patent claims and the circumstances surrounding the prosecution history, that a limitation of a claim does not affect the interpretation of a claim already allowed, *see Durango Assoc. v. Reflange, Inc.*, 843 F.2d 1349, 1357 (Fed.Cir. 1988), the court is not precluded from examining such a limitation to determine whether it implicitly limited an already allowed claim.

Rather than create blanket rules of law precluding district courts from giving estoppel effect to particular types of events in the prosecution history, the Federal Circuit has instructed the courts to evaluate actions taken before the PTO in light of all the circumstances of the individual case. *See, e.g., Mannesmann*, 793 F.2d at 1284–85; *Loctite*, 781 F.2d at 871 n. 7; *SRI*, 775 F.2d at 1120 n. 13; *Builders Concrete*, 757 F.2d at 259. The issue before the court is whether allowing plaintiffs to construe the Fig. 2 claims to encompass the accused products would "resurrect subject matter given up during prosecution to overcome rejections based on prior art." *Hi–Life Products v. American Nat'l Water–Mattress Corp.*, 842 F.2d 323, 325 (Fed.Cir. 1988). The court's examination will focus on both what was surrendered in argument for the patentability of A-claim 18 and the reasons for the surrender. *See id.*

A-claim 18 claimed "[a] composition according to claim 12 without the disulfide bridges shown in the drawing and substituted instead with tetra-S-carbamidomethyl groups on the cysteine residues thereof." PH—Patent Application at 27. A-claim 12, from which A-claim 18 depended, claimed

"[a] composition of matter which comprises a synthetic, biologically active substance which has a structure corresponding to Fig. 1, 2 or 3 of the accompanying drawing." *Id.* at 26. In his first action on the application, the patent examiner rejected A-claim 18 under 35 U.S.C. § 102(b) on the grounds that it was anticipated by the reference designated by the letter "U," a 1968 article written by Bewley et al. (attached as Exhibit A to the Declaration of Gidon D. Stern), which disclosed natural, pituitary-derived HGH substituted in the manner described in A-claim 18. PH—Office Action Aug. 8, 1972 at 2.

In response, the applicant argued as follows:

> Claim 18 is rejected under 35 U.S.C. § 102(b) on the reference U. The reference U discloses a reduced carbamidomethylated HGH. However, claim 18 is dependent from claim 12 which calls for "A composition of matter consisting essentially of a synthetic, biologically active substance...." The reference U shows no way of producing the basic compound required as shown in Figs. 1, 2 or 3 which is a necessary starting material for the carbamidomethylated derivative.

PH—Amendment Dec. 4, 1972 at 3.

The examiner again rejected A-claim 18 under section 102(b) as anticipated by the Bewley article. PH—Office Action April 13, 1973 at 2. The examiner found the applicant's argument that the Bewley reference used natural rather than synthetic HGH as a starting material unpersuasive, stating that "in rejecting the instant claim the preamble 'synthetic.... substance ...' is given no patentable weight." *Id.* The examiner's reason for rejecting the natural/synthetic distinction may be found in his explanation for rejecting A-claim 23: "Since the instant claim is drawn to a composition, no patentable weight is given to the method of making it, thus whether it was chemically synthesized or isolated

---

**5.** In any event, as noted below, the applicant argued before the PTO for a narrow construction of claim 12, one of the claims in suit. As a result, any estoppel effect created by the applicant's arguments applies at least to claim 12 as well as to claim 15 (originally A-claim 18).

from natural sources is immaterial to the rejection." *Id.*

Attempting to overcome the second rejection of A-claim 18, the applicant dropped his argument based on the natural/synthetic distinction and argued instead that A-claim 18 should be allowed because the Bewley reference did not disclose the amino acid structure of HGH.[6] PH—Amendment of Sept. 12, 1973 at 3. The applicant argued that:

> Claims 18 and 32, depend respectively from claims 12 and 29, which are specific to the structure of Figs. 2 and 3, respectively. The claims are therefore limited to the structures shown in the drawings and are not directed broadly to HGH or its derivatives. No such structure is disclosed in the reference U.... Inasmuch as these product claims are specific to the chemical formula of Fig. 2 or Fig. 3, and the reference does not show the same, ... these claims are clearly allowable.

*Id.* The examiner indicated in his next communication to the applicant that A-claim 18 would be allowed. PH—Advisory Action Oct. 5, 1973 at 1.

The applicant thus successfully overcame the examiner's rejection of A-claim 18 by arguing for a narrow construction of A-claim 12, which issued (as amended by the September 12 Amendment) as patent claim 12. The applicant could have amended A-claim 18 by adding a clause specifically limiting the claim to compositions formed of starting materials having the exact structure of Fig. 2. Alternatively, he could have argued for an interpretation of the additional limitations present in dependent A-claim 18 but not in independent A-claim 12 that would distinguish A-claim 18 from the Bewley disclosure. He chose instead to argue that A-claim 12 was "specific" to the structure of Fig. 2. Amendment Sept. 12, 1973 at 3. That the applicant chose to proceed by argument concerning the language of the independent claim is critical to

the issue of prosecution history estoppel in this case.

Had the applicant amended A-claim 18 to add an explicit limitation that did not appear in other claims, the court would be precluded from reading that limitation into claims from which it was absent. *See D.M. I. v. Deere,* 755 F.2d at 1574. Similarly, had he argued for a particular interpretation of limitations unique to dependent A-claim 18, those arguments could not be used to bar a claim of equivalence regarding A-claim 12 from which A-claim 18 depended. *See Slater,* 650 F.Supp. at 457. Instead, however, the applicant "convinced an initially skeptical patent examiner that the literal language" of A-claim 12, as incorporated into A-claim 18, excluded from its coverage the disclosure of the Bewley article. *Id.* at 451. Specifically, the applicant convinced the examiner that the language in A-claim 12 limiting it essentially to substances having "a structure corresponding to Fig. 2 of the accompanying drawing" should be interpreted literally. Since all limitations in A-claim 12 were incorporated by reference into A-claim 18 under 35 U.S.C. § 112 para. 4, A-claim 18 was therefore limited to the structure shown in Fig. 2 and was "not directed broadly to HGH or its derivatives." PH—Amendment Sept. 12, 1973 at 3.

The applicant thus secured the patentability of A-claim 18 by arguing that the structural limitation in A-claim 12 was directed narrowly to Fig. 2 rather than broadly to HGH or its derivatives. The argument was successfully made to disclaim coverage of a substance, disclosed in the Bewley reference, whose starting material had a structure identical to the structure of natural HGH. Plaintiffs now argue, however, that the same structural limitation in A-claim 12, which issued without further amendment as patent claim 12, should be expanded by the doctrine of equivalents to include a substance having a structure identical to that of natural HGH (or, in the case of Protropin, natural HGH

---

**6.** At the same time, the applicant added new A-claims 29–33 and amended A-claim 12 to delete the references to Figs. 1 and 3. A-claim 29 was identical to A-claim 12 (as amended) except that it referred to Fig. 3 instead of Fig. 2; A-claim 32 was identical to A-claim 18 except that it depended from A-claim 29 instead of A-claim 12.

with an additional terminal methionine) but not identical to Fig. 2. The doctrine of prosecution history estoppel prevents plaintiffs from recovering through the doctrine of equivalents subject matter surrendered during prosecution of the patent. *See Hi-Life,* 842 F.2d at 325. Plaintiffs are thus barred as a matter of law from asserting that claim 12 encompasses the accused products within its range of equivalents.

Genentech argues that because all the other Fig. 2 claims (claims 3, 11, 17, 20 and 25) like claim 12 limit their scope to substances having structures "corresponding to" all or some portion of Fig. 2, the other Fig. 2 claims should also be limited by the applicant's argument before the PTO for a strictly literal interpretation of the claim 12 limitation. The court agrees that plaintiffs are estopped by the arguments made before the PTO to assert a range of equivalence for the Fig. 2 claims that encompasses the accused products. The applicant based his argument distinguishing the Bewley reference precisely on the narrowness of the structural limitation in claim 12. Plaintiffs now seek essentially to assert as equivalents "any substance having the structure that turned out to be the true structure of natural HGH." Having argued for an interpretation of the language "a structure corresponding to Fig. 2" that excluded a substance with a structure identical to the structure of natural HGH, plaintiffs cannot argue that the same language used elsewhere in the patent should be construed to cover substances with structures identical to that of natural HGH but different from Fig. 2.[7] The court thus holds that plaintiffs are estopped, as a matter of law, from arguing for a construction of the Fig. 2 claims that would encompass as equivalents the accused products.

Accordingly, the court holds that the accused products do not infringe the Fig. 2 claims either literally or under the doctrine of equivalents. Defendants' first motion for partial summary judgment on the issue of infringement of claims 3, 11, 12, 17, 20 and 25 is therefore granted and plaintiffs' first cross-motion is denied.

## II. *Second Motion for Partial Summary Judgment*

■ Defendants' second motion for partial summary judgment seeks a ruling that Genentech does not infringe claims 1, 3, 11, 18, 20 and 25 ("the process-related claims") because Genentech uses a recombinant DNA technique rather than the solid phase peptide method to synthesize HGH. While the process-related claims themselves do not refer specifically to the solid phase peptide method, listing instead three more general steps necessary to the synthesis, the patent specification sets forth the solid phase peptide method in more detail and states that each of its steps "is essential in the sense that without it the synthetic hormones of the invention cannot be obtained." Meier Dec.Ex. A at col. 2.

The detailed explanation of the solid phase method in the specification discloses the applicant's preferred embodiment of the invention. The claims, rather than the

---

7. Defendants have also argued that other prosecution history amendments and arguments that were intended to disclaim coverage for the Fig. 2 claims of structures corresponding to Fig. 1 or Fig. 3 should be given estoppel effect. *See, e.g.,* PH–Amendment Sept. 12, 1973 at 2 ("claim 12 is directed solely to the compound of Fig. 2"); *id.* at 3 ("[c]laim 23 has been amended to claim the composition of matter produced in accordance with the method of claim 3 *only* when the amino acid sequence is that of either Fig. 2 or Fig. 3"). Because the accused products are indisputably closer in structure to Fig. 2 than to Figs. 1 or 3, however, arguments or amendments limiting the Fig. 2 claims to the structure of Fig. 2 as compared to the structure of Fig. 1 or Fig. 3 cannot bar plaintiffs as a matter of law from arguing that the Fig. 2 claims are entitled to a range of equivalents encompassing the accused products. *See Loctite,* 781 F.2d at 871 (remanded to district court on close question of prosecution history estoppel where invention and accused product "very similar" and disclaimed product distinguishable from both); *Brenner v. United States,* 773 F.2d 306, 307 (Fed.Cir.1985) (summary judgment appropriate only where prosecution history estoppel makes clear that no infringement by equivalents may be found). In contrast, the arguments made for the patentability of A-claim 18 distinguished the Fig. 2 claims from substances having the structure of natural HGH. Protropin II has a structure identical to the structure of natural HGH and Protropin differs by only one terminal amino acid residue, while both accused products differ in several respects from Fig. 2.

specification, measure the scope of the patented invention. *Environmental Designs, Ltd. v. Union Oil Co.,* 713 F.2d 693, 699 (Fed.Cir.1983). The Federal Circuit has held that it is "legally unsound" to argue that a limitation found only in the specification should be read into one of the claims. *Id.* Defendants accordingly argue that statements made during the prosecution of the patent create a prosecution history estoppel barring plaintiffs from arguing that the process-related claims cover any method besides solid phase peptide synthesis. Defendants' failure to address the issue of literal infringement in this context does not affect the outcome because the prosecution history estoppel argument is meritless.

Defendants first argue that an estoppel is created by the applicant's repetition in a brief before the Patent Office Board of Appeals of the statement that each of the steps of the solid phase method was "essential" to the invention. PH—Appeal Brief Dec. 14, 1973 at 5. The portion of the brief containing that statement, however, simply repeats almost verbatim several pages of the patent specification as introductory material. The statement at issue is outside the portion of the brief arguing for the patentability of the rejected claims. *See id.* at 7–9. Because the statement defendants point to does not constitute an argument for the allowability of any claim, defendants cannot invoke the doctrine of prosecution history estoppel on the basis of that statement. *See Townsend,* 829 F.2d at 1090 (prosecution history estoppel applies to arguments "submitted to obtain the patent").

Defendants also point to another sentence in the appeal brief in which the applicant argued that because he had "disclosed these compounds and a method of synthesizing them" he should be allowed latitude in defining his invention through different types of claims. PH—Appeal Brief Dec. 14, 1973 at 8. The quoted phrase does appear within the argument portion of the brief. *See id.* Defendants contend that the quoted phrase constitutes an argument that the applicant was entitled to claims directed to the solid phase method and to products produced by that method, and

should therefore be construed to estop plaintiffs from arguing coverage of other methods. In fact, the quoted phrase refers only to the method specified in the *disclosure,* not to the method described in the claims. The applicant's intent was clearly to convince the Board of Appeals that the invention was sufficiently complex and important, as demonstrated by the specification, to justify allowing the applicant to use different forms of claim drafting to define his invention. *See id.* at 7. Defendants' argument that the quoted phrase was intended to narrow the scope of the process-related claims to the solid phase method is not supported by the context in which the phrase appears.

Defendants' second motion for partial summary judgment on the issue of infringement of claims 1, 3, 11, 18, 20 and 25 and plaintiffs' corresponding second cross-motion are therefore denied.

### III. *Third Motion for Partial Summary Judgment*

Genentech's third motion for partial summary judgment seeks a determination that claims 1, 3, 11, 12, 17, 18, 20 and 25 of the Li patent (all the claims Genentech is charged with infringing) are invalid because they do not enable the manufacture of the claimed invention. Genentech argues that the patent is nonenabling both because it does not accurately identify the structure of HGH and because it does not describe a workable process for synthesizing either HGH or Fig. 2.

The specification of a patent must describe the claimed invention in sufficient detail to enable any person skilled in the relevant art to make and use the invention without undue experimentation. *Atlas Powder,* 750 F.2d at 1576. The breadth of claims supported by a patent's disclosure "varies inversely with the degree of unpredictability of the factors involved." *Application of Fisher,* 427 F.2d 833, 839, 57 CCPA 1099 (1970); *see Spectra–Physics, Inc. v. Coherent, Inc.,* 827 F.2d 1524, 1533 (Fed.Cir.1987). Patents concerning chemical reactions and biological activity, like the patent in suit, generally involve unpre-

dictable factors and thus enable a narrower range of claims. *Fisher*, 427 F.2d at 839. Whether a patent is enabling is a question of law. *Atlas Powder*, 750 F.2d at 1576.

A patent that fails to meet the enablement requirement at the time the patent application is filed is invalid under 35 U.S.C. § 112. *See W.L. Gore & Assocs. v. Garlock, Inc.*, 721 F.2d 1540, 1556 (Fed.Cir. 1983). Once issued, however, a patent is presumed to be valid. 35 U.S.C. § 282. A party challenging a patent's validity must prove invalidity by clear and convincing evidence in order to overcome that presumption.[8] *Atlas Powder*, 750 F.2d at 1573.

■ Defendants argue that claims 1 and 18, which claim a particular method of producing synthetic human pituitary growth hormone and a composition of matter produced in accordance with the method of claim 1, are nonenabling because the specification fails to disclose the correct structure of HGH. As discussed above, the structure disclosed by the patent (Fig. 2) for HGH contains one fewer amino acid residue than natural HGH and shows different amino acid residues in three positions. Defendants have produced no evidence, however, suggesting that a person of ordinary skill in the art would not have been able to determine the structure of natural HGH from the disclosed structure without undue experimentation. Defendants have thus failed to meet their burden of proving by clear and convincing evidence that the patent is nonenabling with respect to claims 1 and 18 due to the disclosure of an incorrect structure for HGH.

■ Defendants have made a stronger showing in support of their argument that the '833 patent fails to enable the making and using of *either* HGH or Fig. 2 because the process disclosed could not be used to produce a peptide as large as HGH or Fig. 2. The '833 patent specification describes Dr. Li's synthesis of Fig. 1, which has a chain length of 188 amino acid residues. Meier Dec.Ex. A, '833 Patent at cols. 7–9. Though the specification states that the same procedure may be used to synthesize Fig. 2, no attempt to synthesize Fig. 2 is described. *Id.* at col. 10. Defendants present uncontroverted evidence that except for Dr. Li's synthesis of Fig. 1, the largest peptide synthesized by the solid phase process as of 1973, two years after the patent application was filed, had a length of only 124 amino acid residues. Li Depo.Ex. 55, Meienhofer, *Peptide Synthesis: A Review of the Solid–Phase Method*, in *Hormonal Proteins and Peptides* Vol. II 51 (Choh Hao Li ed. 1973).[9]

Defendants contend that several inherent problems associated with the use of the solid phase peptide synthesis process to synthesize large peptides render the '833 patent nonenabling as of the filing date of the application and thus invalid. Defendants list incomplete coupling, side chain formation, premature chain termination and purification as problems rendering the solid phase process unworkable for large peptides. All of these problems, however, reduce to purification problems in the final analysis.

The solid phase process involves, in the simplest of terms, affixing an initial amino acid to a solid support and then adding solutions containing the remaining amino acids one by one in a sequence corresponding to the desired ("target") sequence of amino acid residues. At each stage, some of the amino acids contained in the newly added solution fail to hook themselves onto one of the partially constructed chains at all or hook themselves onto the side of a chain instead of the end. In addition, some of the chains terminate before all the stages are completed. As a result, the end product contains a mixture of peptides, some of which correspond to the target sequence and some of which do not. *See* Meienhofer, *supra*, at 59–61. The products not corresponding to the target sequence

---

8. Note that both the bearer of the burden and the standard of proof differ in the case of infringement: the burden falls on the patentee to prove infringement by a preponderance of the evidence. *See SRI*, 775 F.2d at 1123.

9. Note that the book in which the Meienhofer chapter appears was edited by Dr. Li, the patentee.

can be called "side products." *See id.* at 59. Because solid phase peptide synthesis does not involve any purification at intermediate stages of the synthesis, all side products produced during each stage or "cycle" remain in the end product. Therefore, "even very small individual defects can result in serious final deficiencies" when the synthesis involves many cycles. *Id.* at 59.

The synthesis of a peptide containing 191 amino acid residues, like HGH, would involve 190 different stages or "cycles." The synthesis of Fig. 2 would involve 189 cycles. At the end of those 190 or 189 cycles, the person performing the synthesis would have an end product consisting in part of HGH or Fig. 2 molecules and in part of a large number of side products with structures in varying degrees from the target sequence. In order to obtain a substance containing only HGH or Fig. 2 molecules, the end product of the synthesis would have to be purified to remove the side products.[10]

Given the state of purification techniques in 1973, two years after the '833 patent application was filed, syntheses according to target sequences much larger than ten or fifteen amino acid residues yielded "invariably complex mixtures"; after purification, the products were "still at variance with the natural compounds with respect to biological potency." *Id.* at 221–22. Meienhofer concluded that "improved synthetic procedures or more powerful fractionation methods or both" would be required before peptides containing more than twenty amino acids could be obtained in uniform state. *Id.* at 225.

Plaintiffs do not deny the existence or extent of the purification problems associated with the solid phase process, but they contend that purification problems are legally irrelevant to the issue of enablement. This argument is not supported by case law. In a case involving a patent for the preparation of compositions containing adrenocorticotrophic hormones (ACTH), the

Court of Customs and Patent Appeals addressed the purification issue in the context of enablement. *Application of Fisher,* 427 F.2d 833, 839–40, 57 CCPA 1099 (1970). The patent in *Fisher* disclosed examples of ACTH products having potencies within a narrow range but claimed broadly all such products having a specified minimum potency. The *Fisher* court held that the inventor was not entitled to claim substances having a potency much greater than the top of the range disclosed in the specification's examples. The court in *Fisher* distinguished cases cited by the applicant as follows:

> [E]ach involved claims to substantially pure compositions. Such claims do not present the same breadth problem as here, because in those cases the possible range of further purification was either small or nonexistent. Such claims have an inherent upper limit of 100% purity, whereas in the present case it would appear theoretically possible to achieve potencies far greater than those obtained by appellant.

*Id.* 427 F.2d at 839–40.

In this case, as in *Fisher,* it was theoretically possible at the time of filing that scientific developments would permit achievement of potencies far in excess of those achieved by applicant and disclosed in the specification's examples. The only specific example disclosed in the '833 patent exhibited only 10% of the growth-promoting potency and 5% of the lactogenic activity of the natural hormone. Meier Dec.Ex. A, '833 Patent at col. 9. Purification problems restricting the range of activity exhibited by substances produced by the method disclosed in the patent are thus highly relevant to the issue of enablement.

Moreover, the PTO's Board of Patent Appeals and Interferences recently rejected patent claims on enablement grounds in an analogous case involving a class of genetically engineered oral vaccines. *Ex Parte Forman,* 230 U.S.P.Q. 546 (PTO Bd.

---

**10.** The remainder of this discussion involves the difficulty of synthesizing large peptides using the solid phase process. Because there is no significant difference for the purposes of this discussion between a peptide 190 amino acid residues in length and a peptide 191 residues in length, the discussion applies equally to Fig. 2 and HGH.

Pat.App.1986). The Board found that "it is impossible to determine how many mutant strains of the original S. typhi and hyperconjugant strains of the genetically engineered hybrid are originally formed in each experiment and how much time and effort and what level of skill must be exercised to isolate the single strains which are then cloned to yield the useful vaccines." *Id.* at 548. The Board concluded that practice of the invention would therefore require undue experimentation. *Id.* The patent in suit similarly requires isolation of useful substances from a mixture containing a number of undesired products.

Plaintiffs also argue that the purification problems set forth by defendants constituted only "commercialization" problems for the invention and thus did not render the '833 patent nonenabling. A valid patent must enable one skilled in the art to *make* and *use* the claimed invention, however. 35 U.S.C. § 112. The '833 patent enabled only the production of a compound containing, after application of the most effective purification methods available at the time, HGH or Fig. 2 *and* a large number of side products. The resulting compound would not have the potency of the natural hormone. Meienhofer,[11] *supra*, at 222. The problem was not simply that production of HGH or a similarly large molecule by the solid phase method was costly or time-consuming and thus not commercially viable; the problem was that HGH could not, given the state of scientific knowledge at the time the application was filed, be produced by the solid phase process in a homogeneous form which could be *used as HGH.* The '833 patent therefore did not enable the making and using of the claimed invention.

This conclusion is supported by research published by Dr. Li and others in the area of growth hormone research during the years following the issuance of the '833 patent in 1971. It is clear that despite strong continuing interest in synthesis of HGH, researchers in the field were unable to totally synthesize the hormone in a usable form using the solid phase method. In a 1972 essay, Dr. Li described the 1970 synthesis of Fig. 1 set forth in the '833 patent, stating that "the purity of the synthetic product ha[d] not been established" though it exhibited to some degree the growth-promoting and lactogenic activities associated with HGH. Li Depo.Ex. 19, Li, *Human Pituitary Growth Hormone* at 127. Li felt that the "recent synthesis of HGH-like protein [Fig. 1] or peptide fragments possessing HGH activities [was] bound to encourage investigations on the therapeutic usefulness of growth hormone in clinical medicine." *Id.* at 127–28.

Dr. Li gave a paper one year later, in 1973, in which he again described his 1970 synthesis of Fig. 1. Li Depo.Ex. 22, Li, *Human Growth Hormone* at 335–37. Once again, no mention was made of any further attempts on the part of Dr. Li or anyone else to synthesize the complete HGH molecule. In his concluding remarks, Dr. Li stated that one of the important questions remaining in the study of HGH was "Is it possible to *totally* synthesize HGH"? *Id.* at 340.

The Meienhofer paper mentioned above, also published in 1973, includes a table listing all reported peptide and protein hormones prepared by solid-phase synthesis. Meienhofer, *supra*, at 192–216. Under the heading *"Growth hormone, human,"* Meienhofer lists "Growth hormone" with a single citation to Li and Yamashiro (1970), the paper in which Li originally disclosed the synthesis of Fig. 1 described in the '833 patent. Meienhofer, *supra,* at 199. Under the same heading, Meienhofer also lists a number of fragments of HGH with citations to the papers describing their synthesis. If Dr. Li's 1970 synthesis of Fig. 1 is excluded, the largest fragment of HGH listed as successfully synthesized contained only forty-one amino acid residues. *Id.*

In a paper published in 1975, Dr. Li and a colleague noted that "[o]ne of the most

---

**11.** Li's synthesis of Fig. 1, for example, yielded a product having only 10% of the growth-promoting and 5% of the lactogenic activity of natural HGH. The lack of potency was also probably affected by the structural differences between Fig. 1 and natural HGH. *See* Meier Dec.Ex. A, '833 Patent at cols. 9, 4–5.

important long-term goals in the study of HGH is the synthesis of a product with demonstrable therapeutic value." Li Depo.Ex. 47, Bewley and Li, *The Chemistry of Human Pituitary Growth Hormone*, in *Advances in Enzymology* 155 (A. Meister ed. 1975). The only attempted synthesis of the entire HGH sequence described by Bewley and Li, however, was the same synthesis of Fig. 1 described in the '833 patent and Dr. Li's earlier papers. *Id.* at 155–56. Tests on the product of the Fig. 1 synthesis indicated that there were "some fundamental differences between the *in vivo* activity of this material and the native protein." *Id.* at 156.

After a conference devoted to the topic of growth hormone was held at the Kroc Foundation in January 1975, Dr. Li was asked to comment on a draft conference report. Li Depo.Ex. 37. The draft report contained a discussion of efforts to synthesize various fragments of the HGH molecule ranging up to forty amino acids in length. Li Depo.Ex. 37, *Conference on the Structure–Function Relationships of Pituitary Growth Hormone: A Report* at 32–33. The report recited the conclusion of a conference participant, Dr. Tregear, that it would be necessary "to synthesize a much larger fragment" of HGH, perhaps a fragment fifty amino acid residues in length, in order to produce a biologically active peptide. *Id.* at 33. Dr. Tregear "concluded his presentation with a discussion of the difficulties and uncertainties involved in the preparation of a pure peptide of this size in good yield." *Id.* A peptide of the size Dr. Tregear referred to, a sequence of about fifty residues, would be less than a third the length of a complete HGH molecule.

Dr. Li reported on his own work on synthesizing HGH fragments at the Kroc conference. *Id.* at 33–34. One of the fragments synthesized "had some activity at very high doses" but "did not give a dose-response curve parallel to that of native hGH." *Id.* at 34. The other fragment Dr. Li reported synthesizing had low activity in various tests. *Id.*

The draft report also noted that the session on synthesis of HGH fragments concluded with the remarks of another participant, Dr. Stewart, "on the general problems faced in attempting the solid-phase synthesis of peptides of substantial size." *Id.* Dr. Stewart's remarks were summarized in part as follows:

Dr. Stewart stressed the difficulties involved in obtaining quantitative coupling of amino acids to the growing peptide and quantitative removal of side-chain blocking groups.... Dr. Stewart believes it is only possible, when synthesizing large peptides, to produce mixtures rather than a fairly homogeneous product. Thus, sophisticated purification procedures must be developed and strict criteria for chemical homogeneity must be applied, if one wishes to produce a uniform product.

*Id.* at 34–35.

The "Summary and Conclusions" section of the draft report on the Kroc conference read in pertinent part as follows:

Attempts to produce synthetic fragments of growth hormone having significant biological activity have so far yielded rather disappointing results. The peptides produced have been either inactive or marginally effective when given in massive doses. It is difficult to interpret the positive bioassay results because the responses obtained are not typical of those given by the native hormone. As better methodology evolves, it is hoped that larger fragments of the primary structure will be synthesized than those made heretofore and that these will possess substantial biological activity. In any event, the time does not seem to be quite ripe for a major effort to produce synthetic growth hormone peptides for clinical evaluation and use.

*Id.* at 36. In his comments on the draft report, Dr. Li expressed his disagreement with the last sentence quoted above and requested that his disagreement be noted in the final version of the conference report. Li Depo.Ex. 37, letter from Dr. Li to Dr. Kostyo dated April 11, 1975. Dr. Li made no comment on any of the other

language in the draft report's Summary and Conclusions. *Id.*

Six years later, Dr. Li published a paper discussing progress made in research on HGH in the period between 1974 and 1981. Li Depo.Ex. 32, Li, *Human growth hormone: 1974–1981.* In a section entitled "Synthetic fragments," Dr. Li stated that "[a] number of peptide fragments of HGH have been synthesized by the solid-phase method" and "[t]otal synthesis of HGH-like protein has also been attempted." *Id.* at 36. Once again, the only reference given for an attempt to synthesize the complete HGH molecule was Dr. Li's own 1970 paper (with Yamashiro) describing the synthesis of Fig. 1. *Id.*

It is clear from the evidence presented by defendants that at the time the '833 patent application was filed, the method disclosed for the practice of the claimed invention would not have enabled a person skilled in the art to make and use a molecule as large as HGH or Fig. 2. The only relevant evidence submitted by plaintiffs in response to defendants' convincing showing of nonenablement is an excerpt from the deposition of Jon F. Harbaugh, a former employee of Beckman Instruments' Bioproducts Group. Exhibits in support of plaintiffs' opposition to defendants' third motion for summary judgment, Ex. H, Harbaugh Depo. at 31. Harbaugh testified that Beckman's Bioproducts Group used the solid phase synthesis technique to produce peptides for commercial applications. *Id.* at 32. Harbaugh also testified, however, that the longest molecule produced by the bioproducts group contained either 34 or 38 amino acid residues. *Id.* That Beckman could use the solid phase method to synthesize commercially useful peptides 34 or 38 residues long has no bearing on whether anyone could use the same technique to synthesize a molecule 190 or 191 residues long in usable form.

The court concludes that clear and convincing evidence supports defendants' argument that the '833 patent did not enable one skilled in the art to make and use either HGH or Fig. 2. Enablement must be analyzed with respect to the practical utility disclosed in the specification. *See Cross v. Iizuka,* 753 F.2d 1040, 1051 (Fed. Cir.1985). The specification of the '833 patent states that the invention offers a solution to the scarcity of HGH available for clinical use by providing a synthetic method of producing HGH "with the biological activity of the natural hormone[]." Meier Dec.Ex. A, '833 Patent at col. 2. The patent need not, as plaintiffs point out, have enabled the economical commercial production of HGH in order to meet the enablement requirement, but it must have enabled one skilled in the art to make and use HGH in accordance with the practical utility disclosed in the specification. *See Cross,* 753 F.2d at 1051. Defendants have presented uncontroverted, clear and convincing evidence that the '833 patent did not enable persons skilled in the art to synthesize a substance exhibiting biological activity, either in the laboratory or in clinical applications, that was at all similar to the biological activity exhibited by natural HGH.

The court therefore concludes that the '833 patent did not enable the manufacture and use of the invention represented by the claims in suit. Accordingly, defendants' third motion for partial summary judgment as to the invalidity of claims 1, 3, 11, 12, 17, 18, 20 and 25 is granted and plaintiffs' third cross-motion is denied. The court's ruling that all of the patent claims alleged to be infringed are invalid disposes of all remaining issues in the case.

IV. *Motion to Preclude Reliance by Defendants upon the Uncompleted Deposition of Dr. Li*

The court did not rely on the deposition testimony of Dr. Li in determining that the claims in suit were invalid on nonenablement grounds or in ruling on any other motion. Consequently, the court finds it unnecessary to address plaintiffs' motion to preclude reliance on Dr. Li's uncompleted deposition.

V. *Motion for Five Month Extension of Pretrial and Trial Dates*

This motion is mooted by the court's disposition of the third cross-motions for partial summary judgment.

CONCLUSION

Accordingly, defendants' first motion for partial summary judgment as to infringement of claims 3, 11, 12, 17, 20 and 25 is granted and plaintiffs' first cross-motion is denied. Defendants' and plaintiffs' second cross-motions for partial summary judgment as to infringement of claims 1, 3, 11, 18, 20 and 25 are both denied. Defendants' third motion for partial summary judgment as to the validity of claims 1, 3, 11, 12, 17, 18, 20 and 25 is granted and plaintiffs' third cross-motion is denied. The court declines to rule on plaintiffs' motions to preclude reliance on the deposition of Dr. Li and for a five month extension of pretrial and trial dates.

Judgment will accordingly be entered for defendants.

IT IS SO ORDERED.